1  William M. Simpich #106672
   Attorney at Law
2  528 Grand Avenue
   Oakland, CA 94610
3  Telephone:  (415) 542-6809
   bsimpich@gmail.com
4
   Lawrence P. Schnapf*
5  Schnapf LLC
   55 E.87th Street #8N
6  New York, New York 10128
   Telephone:  (212) 876-3189
7  Larry@schnapflaw.com
8
9  Attorneys for Plaintiffs

                    UNITED STATES DISTRICT COURT
10
                    NORTHERN DISTRICT OF CALIFORNIA
11
12
13  THE MARY FERRELL FOUNDATION, INC.      Civil Action No. 4:22-cv-06176
    A 501(c)(3) Massachusetts Registered Corporation,
14  Josiah Thompson and Gary Aguilar,

15
                            Plaintiffs,     FIRST AMENDED COMPLAINT FOR
16                                          DECLARATORY RELIEF, INJUNCTIVE
                                            RELIEF, AND WRIT OF MANDAMUS
17
18  JOSEPH R. BIDEN, in his official capacity   Causes of Action:
    as the Executive Office of the President of the   1.  Non-statutory review of ultra vires action
19  United States, and the National Archives and   2.  JFK Records Act/mandamus
    RECORDS ADMINISTRATION,                 3.  APA
20                                          4.  5 USC 701/Mandamus
                            Defendants.      5.  Federal Records Act
21                                        /
22
23
24
25
26
27
28

1

## INTRODUCTION

1.      Plaintiffs The Mary Ferrell Foundation Inc. (MFF), Josiah Thompson and Gary Aguilar ("Plaintiffs") bring this civil action  seeking declaratory relief, injunctive relief, and a writ of mandamus to compel Defendants President Joseph R. Biden ("President Biden") and the National Archives and Records Administration ("NARA")  to fulfill their ministerial non-discretionary duties under the John F. Kennedy Assassination Records Collection Act of 1992[1] (the "JFK Records Act" or "Act").

2.      Plaintiffs request a judicial order mandating the Defendants to either release all of Assassination Records[2] currently withheld from the public or, in the alternative, to review each individual Assassination Record that has not been publicly disclosed in full using the criteria set forth in sections 5, 6 and 9 of the JFK Records Act and the Federal Records Act of 1950 (the "Federal Records Act").[3]

3.      On October 22, 2021, Defendant President Biden issued an executive memorandum (2021 Biden memorandum) certifying a postponement of an unspecified number of unidentified Assassination Records without conducting the record-by-record review nor identifying the specific grounds for withholding Assassination Records from public disclosure mandated by sections 5, 6 and 9 of the JFK Records Act.  The same errors are repeated in the

---

[1] P. L. 102-526, 106 Stat. 3443 (Oct. 26, 1992); as amended, P. L. 103-345, §§ 2–5, 108 Stat. 3128-3130 (Oct. 6, 1994); as amended, P. L. 105-25, § 1, 111 Stat. 240 (July 3, 1997); codified at  44 U.S.C. 2107 Note.
[2] 36 CFR 1290.1.
[3] Public Law 81-754, 64 Stat. 583 (1950), as amended by Presidential and Federal Records Act Amendments of 2014, Public Law 113–187, as amended by P.L. 115–85; codified at 44 U.S.C. 2201 et seq., § 3101 et seq. and § 3301 et seq.

Biden memorandum issued on December 15, 2022 ("2022 Biden memorandum")[4]. The 2021 Biden memorandum and 2022 Biden Memorandum are collectively referred to hereinafter as the "Biden Memoranda".

4.      Defendant NARA has acted arbitrarily and capriciously in violation of the Administrative Procedures Act (the "APA")[5] by implementing the Biden Memoranda that were issued in violation of the JFK Act.

5.      Defendant NARA has failed to perform certain continuing ministerial non-discretionary duties under the JFK Records Act, including but not limited to: identifying and maintaining an accurate  subject guidebook and index to the President John F. Kennedy Assassination Records Collection (the "JFK Collection");[6] conducting periodic review of postponed or redacted Assassination Records,[7]  and  failing to properly maintain its central directory of Identification Aids.[8]

6.      Defendant NARA, as the successor in function to the Assassinations Records Review Board ("ARRB")[9] has also failed to follow up with certain government offices on outstanding record searches requested by the ARRB in 1998 and to request new searches for Assassination Records since 1998.

---

[4] "Certifications Regarding Disclosure of Information in Certain Records Related to the Assassination of President John F. Kennedy" (December 15, 2022), 87 FR 77967 (December 20, 2022).

[5]  5 U.S.C. § 706.

[6]  44 U.S.C. 2107 note  at § 4(a)(1).

[7]  Id. at § 5(g)(1).

[8]  44 U.S.C. 2107 note  at § 3(6); § 4(a)(2)(B); § 4(d)(1).and § 5(c)(2)(D)(ii). Each Assassination Record contains a unique identification number that appears on the Identification Aid for that Assassination Record.  This unique number consists of 13 digits divided into three parts. The first 3 digits identify the agency, the middle five digits identify the floppy disk number on which the agency created the identification aid, and the last five digits identify the particular record on the agency's  floppy disk. See "Final Report of the Assassination Records Review Board" ( September 30, 1998)  at page 30. The identification aids NARA created are known as  Record Identification Forms (RIFs).

[9] 65 FR 39550 ( June 27, 2000).

3

7.      The failure to carry out these ministerial non-discretionary duties has made it virtually impossible for the Plaintiffs to determine the exact number and identity of partially withheld ("redacted") and withheld-in-full Assassination Records in the JFK Collection as well as Assassination Records that may be located at other government offices that have not been transferred to the Collection.

8.   The failure of Defendant NARA to complete these outstanding ARRB searches for Assassination Records contravenes the express goals established by Congress when it enacted the JFK Records Act.

9.   Defendant NARA has also violated its duty under 44 U.S.C. § 2905 to request the Attorney General initiate action or seek legal redress against those agencies that have failed to complete their outstanding record searches and to recover missing Assassination Records.

10. The failure of the Defendants to comply with their mandatory non-discretionary duties  to ensure full and timely disclosure of all Assassination Records as required by the JFK Records Act  interferes with Plaintiff MFF's core mission to educate the public regarding the assassination of President John F. Kennedy. The unlawful postponement of Assassination Records by Defendant President Biden deprives Plaintiffs from becoming fully informed about the history surrounding the assassination of President John F. Kennedy in contravention of the express goals of the Act.[10]

11. Accordingly, Plaintiffs seek (1) a determination that Defendants have failed to comply with their mandatory non-discretionary duties under the JFK Records Act and (2) an order compelling Defendants to perform their mandatory non-discretionary duties under the Act pursuant to an expeditious deadline set by this Court.

---

[10]44 U.S.C. 2107 note  at §§ 2(a)(4) and  (5); §3 (10).

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURISDICTION AND VENUE**

12.     This Court has personal and subject matter jurisdiction under 28 U.S.C. § 1331 (action arising under the laws of the United States) and the Administrative Procedure Act, 5 U.S.C. §§ 701, et seq. ("APA").

13.     This Court has the authority to enter a declaratory judgment and grant injunctive relief pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201;  the APA[11],  and may issue writs of mandamus pursuant to the Mandamus and Venue Act, 28 U.S.C. § 1361; and the All Writs Act, 28 U.S.C. § 1651.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because members of the Plaintiff MFF along with Plaintiffs Thompson and Aguilar are lawful permanent residents in the district and the Defendants are an agency of the United States or an officer of the United States sued in their official capacity.

**PLAINTIFFS**

15.     Plaintiff The Mary Ferrell Foundation, Inc., ("MFF") is a Massachusetts registered 501(c)(3) corporation, with directors, officers and general members who reside in the Northern District of California. MFF's members include researchers and authors who rely on original source materials for their projects. MFF maintains the largest searchable electronic collection of materials related to the JFK assassination including Assassination Records, documents, government reports and online books totaling nearly two million pages. MFF has developed specialized and sophisticated search tools to facilitate research. As a result, MFF's

---

[11] 5 U.S.C. § 706.

website is often the first place that researchers, authors and historians visit to search for these materials. MFF's  holdings on the JFK assassination include these primary sources:

      a.    **Warren Commission**: 1964 Warren Report, 26 volumes of Hearings and Exhibits, executive session transcripts and Warren Commission Documents;

      b.    **New Orleans District Attorney Jim Garrison Investigation**: Clay Shaw trial transcript, Orleans Parish Grand Jury transcripts and other trial records;

      c.    **President's Commission on CIA Activities Within the United States: ("Rockefeller Commission")**: 1975 Report and publicly available documents;

      d.    **Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities ("Church Committee")**: 14 reports published in 1975 and 1976, and over 100 interview and testimony transcripts;

      e.    **House Select Committee on Assassinations** ("HSCA"): Final Report, 12 appendix volumes, and transcripts of executive sessions, interviews and testimony;

      f.    **Assassination Records Review Board** ("ARRB"): Final Report, medical testimony and exhibits, 1995 and 1996 CIA and FBI releases, internal correspondence and memos, and other electronic records;

      g.    **Federal Bureau of Investigation ("FBI")**: Headquarters files on Lee Harvey Oswald and Jack Ruby, Mexico City Field Office File on Oswald, Headquarters files (HSCA Administrative Folders series);

      h.    **Central Intelligence Agency ("CIA")**: Russ Holmes Work File, HSCA Segregated Collection, and LA Div. Work File;

      i.    **Department of Defense**: Joint Chiefs of Staff ("JCS") Central Files; the papers of JCS Chiefs Maxwell Taylor, General Earl Wheeler Papers, General Lyman Lemnitzer;

the papers of Army General Counsel Joseph A. Califano (Vietnam, Cuba), and Office of Naval Intelligence files;

        j.     **State Department**: Select volumes of the Foreign Relations of the United States;

        k.     **NARA**: Finding aids and declassified documents, including all Assassination Records released in  2017/2018/2021 pursuant to the JFK Records Act;

        l.     **Lyndon Baines Johnson Library and Museum ("LBJ Library")**: phone call tapes and transcripts;

        m.     **Miscellaneous:** These include documents from the President's Foreign Intelligence Advisory Board ("PFIAB"), the  House Select Committee on Intelligence ("Pike Committee"), the White House Communications Agency ("WHCA"), the John F. Kennedy Presidential Library and Museum ("JFK Library") and papers of former Dallas Police Department Captain Will Fritz, and the KGB documents provided by former Russian President Boris Yeltsin.

       16.   MFF has many paid members that reside and/or work in the judicial district of Northern California where this suit is filed. MFF's members have long advocated for the preservation, declassification, and public availability of Assassination Records, and have specifically demanded that Defendants comply with the express terms of the JFK Records Act. MFF has been adversely affected or aggrieved by the Defendants' failure to comply with the JFK Records Act.

       17. Plaintiff Josiah Thompson ("Thompson") is a dues-paying member of MFF who resides and does business in the Northern District of California. Mr. Thompson is a private

investigator and author of books and articles concerning the JFK assassination. Plaintiff
Thompson relies on the MFF website and its specialized search engine for his research.

18. Plaintiff Gary Aguilar ("Aguilar") is a dues-paying member of MFF who resides and
does business in the Northern District of California. Dr. Aguilar is a surgeon and author of
articles concerning the JFK assassination. Dr. Aguilar relies on the MFF website and its
specialized search engine for his research.

## DEFENDANTS

19. Defendant President Joseph Biden is the President of the United States. He is sued in
his official capacity as President of the United States. In that capacity, he issued the Biden
Memoranda challenged in this suit.

20. Defendant NARA is an independent agency that is an agency within the meaning of
5 U.S.C. § 552(f), and is in possession and/or control of the records requested by Plaintiffs that
are the subject of this action. NARA is also charged with the preservation and documentation of
government and historical records including the JFK Collection as well as tasked with increasing
public access to those documents. NARA was directed in the Biden Memoranda to implement
the continued postponements of certain Assassination Records and has done so. NARA acts
through the Activist of the United States ("Archivist"). NARA was directed by Defendant
President Biden through the Archivist to implement the Biden Memoranda and has done so.

## STATUTORY FRAMEWORK OF THE JFK RECORDS ACT

21. As a result of strong public pressure to end three decades of government secrecy
about the assassination of President John F. Kennedy, Congress unanimously enacted the JFK
Records Act in 1992. The Act was signed into law by President George H.W. Bush on October

26, 1992.  The JFK Records Act "*was a unique solution to the problem of secrecy*."[12] Congress enacted the Act because "… *30 years of government secrecy relating to the assassination of President John F. Kennedy led the American public to believe that the government had something to hide. The solution was legislation that required the government to disclose whatever information it had concerning the assassination*."[13]

22.   Congress said "*Continued, **unjustified secrecy** increases those doubts and speculation, and fuels a growing distrust in the institutions of government . . . . **prompt disclosure** of all records relating to the assassination is the best way to fulfill the American people's right to know what happened to their President*."[14] [emphasis added]

23.   In passing the JFK Records Act, Congress found and declared that the "***legislation is necessary to create an <u>enforceable</u>, independent, and <u>accountable process for the public disclosure</u> of such [assassination] records***."[15] [emphasis added].

24.   Congress concluded that the Act was necessary because the Freedom of Information Act ("FOIA")[16] and Executive Order 12356[17] as administered by the Executive Branch had "prevented the **timely public disclosure** of records relating to the assassination of President John F. Kennedy."[18] [Emphasis Added].

---

[12] Final Report of the Assassination Records Review Board September 30, 1998 at page 1 (hereinafter "ARRB Final Report").
[13] Id.
[14] Id. at page 8.
[15] 44 U.S.C. 2107 note at § 2(a)(3).
[16] 5 U.S.C. § 552.
[17] 50 U.S.C. § 401 note.
[18] 44 U.S.C. 2107 note at §2(a)(5) & (6).

9

25.     Congress also found that the Act was necessary because FOIA did not provide public access to unpublished congressional records.[19] Moreover, unlike FOIA, the Act does not allow agencies to rely on the deliberative process and attorney-client privileges exemptions of FOIA as grounds for postponing disclosure.[20]

26.     Congress directed government offices that records relating to the assassination would "*carry a **presumption of immediate disclosure**"*.[21] Because most Assassination Records were 30 years old at the time of the Act, Congress told government offices that it expected that "only in the **rarest of cases** is there any legitimate need for continued protection."[22] [emphasis added]

27.     To accomplish these goals, Congress directed the heads of government offices and executive agencies to search for Assassination Records in their possession and to transfer them to Defendant NARA. In turn,  Defendant NARA was directed to establish the Collection.[23] Congress also prohibited government offices from destroying or altering Assassination Records in their possession or custody.[24]

28.     The JFK Act defines "Executive agency" to include any executive agency defined in the APA and *"any Executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government, including the Executive Office of the President.***"**[25]

---

[19] CRS Report for Congress "President John F. Kennedy Assassination Records Disclosure: An overview" ( March 3, 1993).
[20] Id.
[21] 44 U.S.C. 2107 note at § 2(a)(2).
[22] Id. at  § 2(a)(7).
[23] Id. at  § 5(e).
[24] Id. at § 5(a)(2).
[25] Id at  § 3(4).

10

29.     To ensure the maximum release of Assassination Records, the JFK Records Act established postponement standards in section 6. This section of the Act provides that information in Assassination Records **must be** declassified unless the agency that created the Assassination Record or information contained therein made a showing as described below.[26]

30.     If the government office or agency believed that an Assassination Record should be postponed, the Act provides that the agency could rebut the "**presumption of immediate disclosure**" only by providing "***clear and convincing evidence***" that one of the seven enumerated harms of section 6 of the Act would occur if the particular Assassination Record was released AND that the identified harm outweighed the strong public interest in disclosure.[27] [emphasis added]

31.     The declassification standards of section 6 of the Act requires agencies to balance the national security concerns against the strong public interest in disclosure. Agencies must apply this balancing test BEFORE maintaining the classification of any information.[28]

32.     The "**clear and convincing evidence**" standard is a stringent evidentiary standard akin to that used in criminal law. Congress selected the "**clear and convincing evidence**" standard because "*less exacting standards, such as substantial evidence or a preponderance of the evidence, were not consistent with the legislation's stated goal of prompt and full release.*"[29]

---

[26] Id. at  § 6(1)(c).

[27] 44 U.S.C. 2107 note at  § 6(1)-(5).

[28] Memorandum "*Declassification Guidelines Established by the President John F. Kennedy Assassination Records Collection Act of 1992*" from Robert J. Eatinger, Assistant General Counsel to Chief, Historical Review Group, December 14, 1992 (attachment to CIA Memo for the Record "JFK Records Review - Lessons Learned") ( November 24, 1998) (RIF# 104-10337-10014 ).

[29] House Committee on Government Operations, Assassination Materials Disclosure Act of 1992, 102d Cong., 2d sess., H. Rept. 625, pt. 1, at 25.

33.     In explaining  the JFK Act's stringent declassification standard, Congress said when an agency presented evidence of identifiable harm that would result from disclosure, the identifiable harm "*had to consist of more than speculation.*"[30] Records could not be postponed because of "*some conceivable or speculative harm to national security. Rather in a democracy the **demonstrable harm** from disclosure must be weighed against the benefits of release of the information to the public.*"[31] [emphasis added]

34.     Congress intended the new declassification standards of the JFK Act to be more stringent standard than the general harm test used under FOIA. Because of this congressional intent, the ARRB denied requests for postponements based on generalized harm on the grounds that the arguments did not constitute the "***clear and convincing evidence***" required under section 6.[32] The ARRB, which was the agency that Congress created to administer and interpret the Act, interpreted the "***clear and convincing***" evidence standard to require the agencies to provide very **specific evidence** tailored to the Assassination Records requested to be postponed.[33] When the FBI appealed such a rejection by ARRB, President Clinton upheld this stringent interpretation.[34]

35.     The "**clear and convincing**" standard was not only a new declassification criterion but it also placed the burden on the agency seeking postponement to explain why information should remain shrouded in secrecy.[35]

36.     When the ARRB approved a request to postpone disclosure of an Assassination Record, the Act requires that an unclassified written description of the reason for such continued

---

[30] House Committee on Government Operations, Assassination Materials Disclosure Act of 1992, 102d Cong., 2d sess., H. Rept. 625, at 26.
[31] Id.
[32] ARRB Final Report at page 46.
[33] Id. at page 66.
[34] Id at page 46.
[35] Id. at page 172.

12

postponement be provided to NARA and published in the Federal Register upon such determination."[36]

37.    In addition, the Act requires that all postponed Assassination Records shall be reviewed **periodically** by the originating agency and the Archivist consistent with the recommendations of the ARRB.[37]

38.    Congress also emphasized the supremacy of the JFK Records Act over other laws that might preclude disclosure of Assassination Records. In other words, where the Act requires public disclosure of an Assassination Record, it would "*take precedence over any other law... judicial decision construing such law, or common law doctrine that would otherwise prohibit such transmission or disclosure.*"[38]

39.    For all postponed Assassination Records, the JFK Act mandated that each Assassination Record **shall** be publicly disclosed in full and be available no later than October 26, 2017.[39] The mandated October 26, 2017 statutory deadline was supposed to represent the end of the decades-long effort to release all of the records related to the assassination of President Kennedy.[40] Absent any action by the Executive Branch, NARA was to release the remaining Assassination Records.

40.    If an executive agency sought to postpone further disclosure beyond the October 26, 2017 statutory deadline, the Act authorizes the President to further postpone release of an Assassination Record **only if** the President certifies for **each** record that:

---

[36] 44 U.S.C. 2107 note at § 5(g)(2)(B).

[37] Id. at  § 5(g)(1).

[38] Id. at  § 11(a).

[39] Id. at  § 5(g)(2)(D).

[40] R. Eric Petersen, "*President John F. Kennedy Assassination Records  Collection: Toward Final Disclosure of Withheld Records in October 2017*" CRS Insight ( May 2017).

      a.    continued postponement is made necessary by an **identifiable harm** to the military defense, intelligence operations, law enforcement, or conduct of foreign relations; and

      b.    the **identifiable harm** is of such gravity that it outweighs the public interest in disclosure.[41] [emphasis added]

41.    In deciding if an Assassination Record may be postponed beyond the statutory October 26, 2017 deadline, the Act imposes a ministerial non-discretionary duty on the President to apply the postponement standards of section 6.[42]

42.    Thus, **each** individual Assassination Record that the President seeks to certify for further postponement beyond the statutory October 26, 2017 deadline, the President must (a) identify one or more of the seven grounds of identifiable harm set forth in section 6 applicable to the **individual** Assassination Record; and (b) provide an explanation under the stringent "***clear and convincing***" evidence standard on how public disclosure would be so harmful that it outweighs the strong public interest in disclosure.[43]

## ARRB IMPLEMENTATION OF THE JFK ACT

43.    The ARRB initiated a compliance program to ensure that all agencies in possession or control of Assassination Records complied with their obligation under JFK Act.[44] This program included obtaining "Final Declarations of Compliance" from all agencies with Assassination Records.

---

[41] 44 U.S.C. 2107 note  at. § 5(g)(2)(D)(i)-(ii). The postponement criteria are set forth in section 6 of the Act.

[42] Id. at § 6(1)-(5).

[43] Id.

[44] ARRB Final Report at  page 145. These obligations included conducting a thorough search for Assassination Records, organizing and reviewing Assassination Records, responding to ARRB requests for information and Assassination Records and transmitting  its Assassination Records to NARA. Id.

14

44.     At the time the ARRB ceased operating, several agencies such as the FBI[45], the Immigration and Naturalization Service ("INS")[46]and  the JFK Library[47] were still searching for documents that might qualify as Assassination Records while others such as the Secret Service[48] and the Drug Enforcement Administration ("DEA") did not execute the required sworn Final Declarations of Compliance.[49]

45.     In its final report, the ARRB disclosed that the Office of Naval Intelligence ("ONI") acknowledged there were additional records that had not been reviewed by September 1998 but that ONI would review them not under the JFK Act but insisted on reviewing these records under the requirements of Executive Order 12958![50]

46.     When the ARRB dissolved in September 1998, ARRB had propounded requests to search for additional designated assassination-related records to certain agencies including the CIA, Department of Defense and FBI remained outstanding.[51]  In addition, the ARRB was also working with the JFK Library and the RFK Donor Committee at the time of the final report to release certain papers of former attorney general Robert F. Kennedy.[52]

47.     On the eve of the October 26, 2017 statutory deadline to release the remaining postponed Assassination Records, then President Donald J. Trump issued a Memorandum instructing NARA to temporarily postpone the public disclosure of an unspecified number of

---

[45] Id. at page 149.

[46] Id. at pages 155-56.

[47] ARRB was still working with the JFK Library and the RFK Donor Committee at the time of the final report to release certain papers of Robert F. Kennedy. ARRB Final Report at pages 162 and 168 note 9.

[48] Final ARRB Report at page 149.

[49] The PFIAB challenged ARRB's authority to identify PFIAB documents as assassination records. Final ARRB Report at page 155.

[50] ARRB Final Report at page 158.

[51] Id. at pages 145, 149, and 155-56.

[52] Id. at pages 162 and 168 note 9.

15

unidentified Assassination Records for six months.[53] He then issued a second Memorandum on April 26, 2018 instructing NARA to further postpone the public disclosure of a continuing unspecified number of unidentified Assassination Records for another three and a half years beyond the statutory deadline.[54](collectively, the "Trump Memoranda").  NARA complied with the Trump Memoranda.

## DEFENDANT PRESIDENT BIDEN ISSUES MEMORANDUM POSTPONING ASSASSINATION RECORDS

48.    Despite the fact that the agencies had 25 years under the original statutory deadline of the Act and then another 4 years under the Trump memoranda to comply with their mandated non-discretionary duties, Defendant President Joseph Biden issued the 2021 Biden Memorandum" instructing NARA to further postpone release of an unspecified number of unidentified Assassination Records.[55] President Biden issued the 2022 Biden Memorandum  on December 15, 2022. [56] Defendant NARA has complied with the Biden Memoranda.

---

[53]"Temporary Certification for Certain Records Related to the Assassination of President John F. Kennedy" Memorandum for the Heads of Executive Departments and Agencies ( October 26, 2017), 82 FR 50307( October 31, 2017).

[54] "*Certification for Certain Records Related to the Assassination of President John F. Kennedy,*" Memorandum of for the Heads of Executive Departments and Agencies ( April 26, 2018),  83 F.R. 19157 ( May 2, 2018). Plaintiffs assert that the two Trump certifications of postponement did not comply with his ministerial non-discretionary duties under  sections 5, 6 and 9 of the Act. However, since President Trump is no longer in office, the Trump postponement memos are not subject of this complaint.

[55] "*Memorandum for the Heads of Executive Departments and Agencies on the Temporary Certification Regarding Disclosure of Information in Certain Records Related to the Assassination of President John F. Kennedy*" ( October 22, 2021), 86 FR 59599 (October 27, 2021).

[56] "Certifications Regarding Disclosure of Information in Certain Records Related to the Assassination of President John F. Kennedy" (December 15, 2022), 87 FR 77967 (December 20, 2022).

49.     Defendant Biden's certifications to postpone disclosure of Assassination Records violated sections 5, 6 and 9 of the JFK Act because Defendant Biden postponed disclosure:

a. Without conducting a record-by-record review of and certification for each Assassination Record;

b. Without identifying the specific alleged Identifiable Harms that would result if a particular Assassination Record or information contained therein would be disclosed;

c. Without providing the mandated explanation of how the Identifiable Harm was of such gravity that it outweighed the public's interest in disclosure of each Assassination Record; and

d. Using non-statutory criteria as a basis for certifying postponement of Assassination Records.

50.     Instead of making these required mandatory findings for **each** Assassination Record to be postponed,  Defendant President Biden simply:

**a.**     Certified that "all the information" within Assassination Records that agencies proposed for continued postponement were to be withheld from full public disclosure until December 15, 2022 – and then continued this date again to June 30, 2023 - in violation of the requirements of section 5(g)(2)(D) of the Act;[57]

**b.**     Instructed that an agency should not propose postponement of information beyond December 15, 2022 – and then continued this date again to June 30, 2023 - except when

---

[57] 2021 Biden Memorandum at § 3; 2022 Biden Memorandum at § 2-3.  The JFK Act requires that the President's certification to be done on a document-by-document basis and not a sweeping certification for "all information".  The president also failed to disclose the "clear and convincing" evidence for each Assassination Record that justified the certification of postponement. See 44 U.S.C. 2017 note at  § 5 (g)(D) and  § 6.

17

the "***strongest possible reasons***" counsel otherwise.  The phrase "***strongest possible reasons***" is not one of the statutory criteria for certifying postponement set forth in section 6 of the Act;[58] [emphasis added]

        **c.**    Did not require the agencies seeking postponement beyond December 15, 2022  to comply with the requirements of section 5(g)(2)(D) nor make the mandatory findings of section 6 the Act. Instead, Defendant President Biden simply instructed the agencies that if they proposed to further postpone records beyond December 15, 2022, they were to provide a proposed date when the agency "***reasonably anticipated that continued postponement would no longer be necessary"*** or, "*if that is not possible, a specific proposed date for each record, identifying when the agency would propose to next review again after December 15, 2022;*"[59] [emphasis added].

        **d.**  Allowed agencies seeking to further postpone Assassination Records past December 15, 2022 to only demonstrate "**anticipated harm"-** a phrase that not does not appear in the Act and is more lenient than the statutory criteria.[60] [emphasis added]

       51.    In addition, Defendants President Biden and NARA did not assure compliance with the mandatory non-discretionary duty to publish in the federal register a summary of the postponement decision for **each** record including identifying the originating agency and grounds for each postponement Assassination Record.

---

[58] 2021 Biden Memorandum  at § 1 and 5; 2022 Biden Memorandum at § 1, 2, and 6.

[59] 2021 Biden Memorandum at §5(c)(iii);

[60] 2021 Biden Memorandum at  § 5(d)(i)-(iv). The phrase "**anticipated harm**" is not a criterion appearing in Section 6 of the Act or for that matter anywhere in the statute. Instead, the Act requires the agencies seeking further postponement to demonstrate "**identifiable harm**" which connotes present harm, not a future harm.  Nor is it used in the 2022 Biden Memorandum.

52.     Each of the aforementioned statutory obligations are ministerial non-discretionary duties of the President and NARA pursuant to the JFK Records Act.[61]

## DEFENDANT NARA HAS FAILED TO COMPLY WITH ITS MANDATORY MINISTERIAL NON-DISCRETIONARY DUTIES UNDER THE JFK ACT

53.     Defendant NARA is the successor agency to the ARRB, and has assumed responsibility for ensuring compliance with the Act.[62] The ministerial non-discretionary duties include following up with agencies to complete outstanding ARRB search requests, to search for additional information and Assassination Records as well as to direct agencies to locate lost and missing records as their existence becomes known.

54.     Upon information and belief, Defendant NARA has failed to follow-up on the outstanding 1998 ARRB record search requests. Earlier this year, several of Plaintiff MFF's members requested Defendant NARA to provide an update on the status of these outstanding ARRB record search requests. To date, Defendant NARA has not responded to this inquiry.

55.     Defendant NARA has also failed to comply with a number of ministerial non-discretionary duties mandated by the JFK Records Act involving maintaining the JFK Collection.

56.     The JFK Records Act requires Defendant NARA to create a central directory comprised of identification aids created for each Assassination Record transmitted to Defendant NARA so that Assassination Records may be available to historians, researchers and the American people.[63]

---

[61] 44 U.S.C. 2107 note at § 5(g)(2)(D)(i)and (ii).
[62] 65 FR 39550 ( June 27, 2000).
[63]44 U.S.C. 2107 note at § 4(a)(2)(B).

19

57.     The only known central directory is currently a six-part spreadsheet comprising identification aids for 319,106 Assassination Records. This central directory is available on Defendant NARA's public website at

https://www.archives.gov/research/jfk/search. This central directory is deficient in the following ways:

a.     **The Central Directory contains no identification aids for some agencies:** The complete set of records supplied to Defendant NARA by some government offices are entirely missing from the central directory as if they were never received. These include Secret Service records (record number prefix 154), National Security Archive records (prefix 144), National Security Council records (prefix 145), and the US Army Investigative Records Repository records (prefix 194). For example, 360 records from these offices were placed online after 2017 by NARA but are currently missing from the central directory.

b.     **Central Directory is missing other identification aids**: There are other identification aids missing from the central directory. Of the Assassination Records released online by NARA since 2017, 472 FBI records (prefix 124), 250 John F. Kennedy library records (prefix 176) and one Defense Intelligence Agency record (prefix 111) do not currently appear in the central directory. Identification aids for additional extant records may be missing from the central directory. Because of the inadequate condition of the central directory, Plaintiffs have no practical way to determine how many identification aids are missing.

c.     **Redactions in the central directory:** More than 5,000 identification aids feature one or more redactions. Defendant NARA should review these redactions to determine if they comply with Act's declassification standards.

d.     **Reclassifications in the central directory**: The six-part spreadsheet that was

posted by Defendant NARA on June 28, 2021 contains several identification aids with redactions in fields that had not been previously redacted. The JFK Act prohibits reclassification of Assassination Records that have already been publicly disclosed.[64]

      **e.**    Further details on the above deficiencies, including spreadsheets containing lists of record numbers and record descriptions, may be located on Plaintiff MFF's website at: https://www.maryferrell.org/pages/State_of_JFK_Releases_2022.html

    58.    NARA states on its website that 520 documents remain withheld- in-full. Upon information and belief, Plaintiffs allege that the true number of withheld- in- full Assassination Records is higher but the precise number is unclear. For example:

    a. **Department of Justice (DOJ) records dropped from the release list**: In response to a 2016 FOIA Request, Defendant NARA released a list of 3,603 withheld-in-full Assassination Records to be released, which was then reduced to 3,598 Assassination Records and then finally diminished to 3,571 Assassination Records. In response to an inquiry by Plaintiff MFF about the latter reduction, Defendant NARA replied the discrepancy was because the last page of 27 DOJ Assassination Records had been inadvertently removed. These 27 records have never been posted online and their release status is unclear.

    b. **Records declared "open in full" which are not publicly available**: The declassification status of many entries in the central directory appears to be inaccurate. In response to inquiries by Plaintiff MFF regarding missing records in the 2017 releases, Defendant NARA supplied a list that included 337 records marked "Released in Full prior to 2017 project." Defendant NARA provided assurances that these records were "determined to be open in full in the open Collection." Plaintiff MFF spot-checked a subset of these 337 records at the NARA

---

[64] Id. at §5(a)(3).

College Park facility where the records are located. The majority of those Assassination Records checked were, in fact, not publicly available.

c. **Unaccounted for records from the 2017 review**: Plaintiff MFF conducted an analysis of the 2016 NARA listing of records withheld-in-full that were scheduled to be released, comparing it against those Assassination Records that were subsequently released by Defendant NARA. Even after subtracting out the records withheld under sections 10 and 11 of the JFK Records Act, and other records identified by NARA as missing or declared released but not put online, twelve records remain missing without explanation.

d. Lists of records described in the foregoing paragraphs may be located on Plaintiff MFF's website at https://www.maryferrell.org/pages/State_of_JFK_Releases_2022.html

59. Based on a representative sampling of the Collection, there are Assassination Records with significant redactions that are not justified under the section 6 declassification criteria of the Act, including:

a. A June 30, 1961 Memorandum from Arthur Schlesinger Jr. to President Kennedy about reorganizing the CIA after the Bay of Pigs;[65]

b. Personnel file of senior CIA counterintelligence officer Birch D. O'Neal who controlled the CIA's Lee Oswald file from November 1959 to November 1963;[66]

c. Personnel file of senior CIA operations officer David Atlee Phillips who told conflicting stories about Lee Oswald's Sept. 1963 visit to Mexico City;[67]

d. Personnel file of senior Dallas-based CIA operations officer James Walton Moore who was informed about Oswald's return to Texas in 1962 and allegedly told a

---

[65] NARA Record Number 176-10030-10422.
[66] NARA Record Number 104-10291-10014.
[67] NARA Record Number 104-10194-10026.

CIA asset that Oswald was "harmless;"[68]

       **e.**    February 1962 Defense Department Northwoods plan for a "false-flag" operation to stage a violent incident in U.S. and blame it on Cuba;[69]

       **f.**    Files on CIA-funded group DRE AMSPELL which publicized Oswald's pro-Castro activities in August 1963 and sought to blame JFK's assassination on Cuba in November 1963;[70]

       **g.**    June 25, 1975 testimony of William K. Harvey (CIA chief in charge of the ZR-Rifle Castro assassination program) to the Senate Select Committee on Intelligence Activities;[71]

       **h.**    A JFK document removed from the security file of Watergate burglar E. Howard Hunt.[72]

       **i.**    Identity of "the infiltration team with mission of assassinating" Cuban Premier Fidel Castro, listed in attachment to September 10, 1964 report on "activities of AMWORLD."[73]

    60.    **Failure To Complete ARRB Compliance Program:** The ARRB Final Report disclosed that the Secret Service had failed to provide a Final Declaration of Compliance under penalty of perjury. Likewise, the Drug Enforcement Administration failed to formally designate Assassination Records and did not submit a sworn Declaration of Compliance report. As the

---

[68] NARA Record Number 1993.07.22.17:13:03:960590.
[69] NARA Record Number 202-10002-10104.
[70] NARA Record Number 104-10170-10121.
[71] NARA Record Number 157-10002-10106.
[72] NARA Record Number 1993.07.24.08:37:38:680310.
[73] NARA Record Number: 104-10308-10086.(These redacted identities are listed in a separate attachment to this report as "Iden A; Iden B; Iden C; Iden D; Iden E; Iden F; Iden G; Iden H; Iden I; Iden J;Iden K; Iden L; Iden M and Iden,N").

successors to the ARRB, Defendant NARA has a ministerial non-discretionary duty to pursue Final Declarations Statements of Compliance from the recalcitrant agencies that had not completed the ARRB compliance program or that had outstanding ARRB search requests. Upon information and belief, Defendant NARA has failed to perform its ministerial non-discretionary duty to conduct a new round of responses from all agencies for Assassination Records in the post-ARRB period.

61.    **New search of Assassination Records**: The JFK Act remains in effect until Defendant NARA acting through the Archivist issues a certification to Congress that all Assassination Records have been obtained and transferred to the Collection.[74]  Upon information and belief, additional Assassination Records exist that have not been transmitted to Defendant NARA and that are not currently  part of the Collection. Also, on information and belief, Defendant NARA has not followed-up on the outstanding ARRB records search requests nor have several agencies submitted sworn Final Declarations of Compliance. Until these outstanding items are completed and the ARRB compliance program completed, Defendant NARA acting through the Archivist is prohibited under section 12 of the Act from certifying that all Assassination Records have been obtained and transferred to the Collection. As the successor to the ARRB, Defendant NARA has a ministerial non-discretionary duty to complete the outstanding search requests and to conduct a new search for Assassination Records known to exist but that are not part of the JFK Collection.   Such a new search should include the following documents:

a.    **CIA files of George Joannides**: Mr. Joannides served as chief of covert action at the CIA station in Miami and  served as case officer for a New Orleans-based CIA-

---

[74]  44 U.S.C. 2107 note at § 12(b).

1  funded exile group that had a series of encounters with Lee Oswald in 1963. According to former

2  ARRB board members, 44 Joannides documents from 1962-64 and 1978-81  constitute

3  Assassination Records entitled to "the presumption of immediate disclosure" and should have

4  been transferred to the ARRB to determine if they should be disclosed. Instead, the CIA withheld

5  the Joannides files from the ARRB and continues to withhold these files. The CIA should be

6  ordered to transfer these materials to the NARA.[75]

7

8       b.      **Attorney General Referral to Unseal FBI Surveillance Tapes of**

9  **Carlos Marcello:** In the late 1970s, the FBI recorded approximately eight months of electronic

10 surveillance on Carlos Marcello pursuant to 18 U.S.C. § 2501 *et seq*. With the assistance of the

11 United States Attorney's Office in the Eastern District of New Orleans, the ARRB obtained a

12 court order to review transcripts of the FBI's surveillance on Marcello in New Orleans. The

13 ARRB determined that 13 of the conversations were Assassination Records.[76] Though the

14 transcripts were part of the JFK Collection, researchers have been unable to hear the actual tape

15 recordings because they remain sealed.[77] Likewise, the FBI recorded conversations between

---

[75] In  2004, three former members of the ARRB submitted sworn affidavits in *Morley v. CIA*, a Freedom of Information Act lawsuit, stating that the Joannides files met the board's criteria of "assassination-related" and should be released.  In her affidavit, former ARRB member Anna Nelson stated that "*the Freedom of Information Act, as implemented by the executive branch, has prevented the timely public disclosure of records relating to the assassination of President John F . Kennedy*." ARRB counsel Gunn in his declaration stated that the CIA "*undermined the investigation which the House Select Committee on Assassinations made of the JFK assassination in 1976-1978*."ARRB Chair  Judge John Tunheim wrote "*By its actions, the CIA has thus destroyed the integrity of the probe made by Congress and cast additional doubt upon itself. It is imperative that all additional information which bears upon the CIA's conduct regarding both the congressional investigation and the Kennedy assassination itself be made public as soon as possible.*"

[76] ARRB Final Report at page 104.

[77] Author John H. Davis was able to obtain release of 158 of approximately 1,400 reels of tapes pursuant to the Freedom of Information Act. See *Davis v  DOJ*, 2007 U.S. Dist. LEXIS 88374 (D.D.C. 12/07/2007).

Carlos Marcello and his cellmate, Jack Van Laningham, between 1985 and 1986. According to the FBI unit director, Thomas Kimmel, Mr. Marcello told Van Laningham that he was involved in  JFK's assassination. While the relevant files were turned over to NARA in 2006, the tape recordings of the Marcello-Van Laningham conversations remain unavailable to researchers. Plaintiffs cannot fully evaluate the veracity and significance of these conversations without being able to listen to the actual recordings.  Upon information and belief, Defendant NARA, as successor to ARRB, has failed to request the assistance of the Department of Justice to unseal all tape recordings of Marcello conversations mentioning JFK's assassination[78] in violation of its ministerial non-discretionary duty.

c.    **New Search for all government files of certain "key persons" and persons and organizations of interest:** The ARRB did not review government agencies files about  "key persons" and persons and organizations of interest that had been identified by the Warren Commission. Upon information and belief, Defendant NARA has failed to perform its ministerial non-discretional duty as the successor to the ARRB to complete these searches of "key persons" and persons and organizations of interest.

d.    **Missing Church Committee Records, among others:** The ARRB Final Report states that many files that ARRB identified as Assassination Records are missing, including, but not limited to, Church Committee records.[79] Upon information and belief, Defendant NARA has failed to perform its ministerial non-discretional duty as the successor to the ARRB to complete these searches for the missing Church Committee files.

---

[78] See 44 U.S.C. 2107 note at  §10(a) &(b).
[79] ARRB Final Report at  page 164.

e.      **Missing Attachments to Assassination Records:**  There are also missing attachments to Assassination Records with no indication if the originating agency retains possession, custody and control of these attachments. Upon information and belief, Defendant NARA has failed to perform its ministerial non-discretionary duty, as successor to the ARRB, to direct the originating agency to search for these missing Assassination Records.

f.      **Destruction of Assassination Records: The** JFK Act explicitly prohibits the destruction, alteration, or mutilation of Assassination Records. [80] The ARRB Final report reported CIA, FBI, Secret Service and other organizations intentionally destroyed documents[81] yet no action has been taken to address these violations of the Act. In addition, 44 USC 2905 mandates that NARA "***shall*** *notify the head of a Federal agency of any actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of the agency that shall come to the Archivist's attention, and assist the head of the agency in initiating action through the Attorney General for the recovery of records unlawfully removed and for other redress provided by law.*" Moreover, where the head of a Federal agency does not initiate an action for such recovery of such records or other redress within a reasonable period of time after being notified of any such unlawful action or is participating in, or believed to be participating in any such unlawful action, NARA "***shall*** *request the Attorney General to initiate such an action, and shall notify the Congress when such a request has been made.*" Upon information and belief, Defendant NARA acting through the Archivist, has not taken any action against the agencies that have destroyed Assassination Records, notified the head of the relevant

---

[80] 44 U.S.C. 2107 note at § 5(a)(3).

[81] For example, the ARRB disclosed that the Secret Service destroyed certain files AFTER the ARRB had requested the records. ARRB Final Report at  page 149.

agency nor sought the assistance of the attorney general in violation of its ministerial non-discretionary duties under both the JFK Act and the Federal Records Act.[82]

## STATUTORY FRAMEWORK OF THE FEDERAL RECORDS ACT

62.     The Federal Records Act ("FRA") is a collection of statutes that govern the creation, management, and disposal of federal or "agency" records.[83] The FRA requires that federal agencies establish: (1) a program to make and preserve agency records; (2) effective controls over the creation, maintenance, and use of records; and (3) safeguards against the removal or loss of records.[84]

63.     The disposal of any federal record is governed by the FRA.[85] These provisions provide the exclusive procedure by which all federal records may be disposed or destroyed.[86]

64.     Under the FRA, federal records may not be disposed or destroyed without authorization of Defendant NARA. Specifically, prior to destroying any federal record, the head of each agency must submit to NARA a list of any federal records that do not appear to have sufficient value to warrant their continued preservation.[87]

65.     The FRA also provides several mechanisms for the restoration of lost or destroyed agency records. First, the FRA places an independent duty on Defendant NARA to initiate action to recover agency records. Namely, if Defendant NARA becomes aware of any "*actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of [an] agency,*" Defendant NARA must notify the agency head and assist the agency

---

[82] 44 USC § 3104.
[83] Id. at § 2101-18, 2901-09, § 3101-07 and § 3301-24.
[84] Id. at § 3101, § 3102 and § 3105
[85] Id. at § 3301 et seq.
[86] Id. at § 3314.
[87] Id. at § 3303.

28

head in initiating action through the Attorney General for the recovery of the wrongfully removed records and for other legal redress.[88] If the agency head refuses to pursue legal remedies, Defendant NARA must request that the Attorney General take action and must inform Congress that the agency has made this request.[89]

66.    The FRA places a similar and independent duty on the head of each federal agency to "*initiate action through the Attorney General for the recovery of records he knows or has reason to believe have been transferred to his legal custody*."[90] If the agency head refuses to pursue legal remedies himself, NARA must then request that the Attorney General take action and must inform Congress that NARA has made this request.[91]

**PLAINTIFFS HAVE BEEN HARMED AND CONTINUE TO BE HARMED BY DEFENDANTS' ACTIONS**

67.    Plaintiffs have suffered injury as a result of Defendant President Biden issuing the Biden Memoranda requiring further postponement of Assassination Records in violation of the JFK Act. As a result of the unlawful withholding of Assassination Records, Plaintiff MFF has been and continues to be unable to include thousands of postponed Assassination Records in its collection, thereby depriving Plaintiffs Thompson and Aguilar along with other MFF members, researchers and historians with the ability to learn about the assassination. Plaintiff MFF has also forced to divert its resources from its core mission and instead devote time analyzing which Assassination Records were redacted or withheld-in-full by the unlawful Biden Memoranda and to communicate with members which Assassination Records were partially redacted or withheld in full to its member and website visitors.

---

[88] Id. at  § 2905(a).
[89] Id. at  § 2905(a).
[90] Id. at § 3106.
[91] Id. at  § 3106.

68.     The failure of the Defendant NARA to adequately maintain the Collection has forced Plaintiff MFF to divert resources from its core mission and instead devote time analyzing which Assassination Records were partially redacted or withheld in full by the unlawful Biden Memoranda. Likewise, Plaintiffs Thompson and Aguilar have been prevented from reviewing Assassination Records unlawfully redacted  or withheld-in-full by the Biden Memoranda.

69.     Accordingly, Plaintiffs satisfy  the "zone of interest" because they have and will continue to suffer irreparable injury if the Biden Memoranda is not declared void and unlawful.

70.     Plaintiffs have requested Defendant President Biden to comply with the JFK Records Act to no avail and has no further right of review or appeal except to file this lawsuit.

71.     Plaintiffs have no adequate remedy at law and will suffer irreparable injury if the Biden Memoranda are not declared void and unlawful, or if the Defendants are not enjoined from continuing to withhold Assassination Records that do not qualify for postponement under the section 6 criteria.

## FIRST CAUSE OF ACTION
**(Non-Statutory Review of *Ultra Vires*  Action)**
**(As to Defendant President Biden)**

72.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

73.     The JFK Act establishes specific standards and procedures for postponing Assassination Records that are contained sections 5, 6 and 9 of the JFK Records Act. The statutory postponement standards are ministerial non-discretionary duties.

74.     Such specific ministerial non-discretionary duties are mandated to be performed by the President as a necessary condition for any certification of postponement to be issued by the President.

75.     The President may not take any action that exceeds the scope of his statutory authority.

76.     The Biden Memoranda certified postponement of public disclosure of an undetermined number of unidentified Assassination in violation of the statutory criteria set forth in sections 5, 6 and 9 of the JFK Records Act, including but not limited to:

        a.     Using criteria that do not appear in the Act;

        b.     Failing to certify the existence of identifiable harms of such gravity that  outweigh the public interest in disclosure on a **record-by-record basis**, using the **clear and convincing standard** of section 6 of the Act; and

        c.     Failing to provide an unclassified written description of the reason for such continued postponement for each assassination record.

77.     The ability to enjoin unconstitutional actions by government officials is a creation of courts of equity dating back to England and has been traditionally available in American courts.[92]

78.     When Congress limits its delegation of power, courts infer that Congress expects this limitation to be judicially enforced. "*When an executive acts ultra vires, courts are normally available to re-establish the limits on his authority.*"[93]

79.     The APA does not displace all constitutional and equitable causes of action. "*Prior to the APA's enactment . . . courts had recognized the right of judicial review of agency actions that exceeded authority,*" and "[n]*othing in the subsequent enactment of the APA altered [that] doctrine of review,*" to "repeal the review of ultra vires action*s*."

---

[92] *Armstrong v. Exceptional Child Center, Inc*., 575 U.S. 320, 135 S. Ct. 1378, 191 L. Ed. 2d 471 (2015).

[93] *Dart v. United States*, 848 F.2d 217, 223-24 (D.C. Cir. 1988).

31

80.     The responsibility of determining the limits of statutory grants of authority "*is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction.*"[94]

81.     Under the JFK Act, the court is empowered to ensure that the Congressional goal of "*enforceable, independent, and accountable process for the public disclosure of such [assassination] records*" is achieved.[95]

82.     Defendant President Biden exceeded his statutory authority under the JFK Act and acted *ultra vires* when he certified the postponement of Assassination Records using non-statutory criteria and failed to apply the statutory postponement criteria to each Assassination Record.

83.     Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that exceeds Defendant President Biden's statutory authority and is therefore *ultra vires*.

84.     The public interest favors entry of a declaration that the Biden Memoranda are void, contrary to law, and *ultra vires* because implementation of the Biden Memoranda violated the express terms of the Act and its implementation has frustrated the express intent of Congress of prompt disclosure of Assassination Records.

85.     Because the Biden Memoranda direct agencies to take action contrary to the JFK Act passed by Congress, this Court should declare that the Biden Memoranda are void, of no force and effect, and enjoin implementation of the Biden Memoranda.

**SECOND CAUSE OF ACTION**
**(Violations of the JFK Records Act/Mandamus)**
**(As to Defendant President Biden)**

---

[94] *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1327(D.C. Cir. 1996).
[95] 44 U.S.C. 2107 note at § 2(a)(3).

86.     The foregoing allegations are incorporated and repeated as though fully set forth herein.

87.     In issuing the Biden Memoranda, Defendant President Biden violated certain ministerial non-discretionary duties with respect to the postponement of disclosure of assassination records under 5, 6 and 9 of the JFK Records Act including:

a.     Failing to certify the existence of the **identifiable** harms of such gravity that outweigh the public interest in disclosure on a record-by-record basis, using the "**clear and convincing**" standard;

b.     Failing to provide an unclassified written description of the reason for such continued postponement for each assassination record;

c.     Failing to ensure that this description is provided to the Archivist and published in the Federal Register upon determination; and

d.     Failing to ensure the periodic review of the postponed releases.

88.     Defendant President Biden has a ministerial non-discretionary duty to comply with the procedural requirements of the JFK Records Act, including but not limited to those set forth in the preceding paragraphs.

89.     Plaintiffs are beneficially interested in the performance of the Defendant President Biden's ministerial non-discretionary duties under the JFK Records Act.

90.     Defendant President Biden has the present ability to perform the above-described statutory and ministerial non-discretionary duties.

91.     Plaintiffs have previously requested Defendant President Biden to perform his mandatory ministerial and non-discretionary duties under the JFK Records Act with no response.

33

92.     This Court has jurisdiction to compel the Defendant President Biden to perform a non-discretionary ministerial duty pursuant to the Mandamus and Venue Act.[96]

**THIRD CAUSE OF ACTION**
**(Violation of APA)**
**(As to Defendant NARA)**

93.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

94.     Defendant NARA is an "agency" under the APA.[97]

95.     The implementation of the Biden Memoranda by redacting or withholding in full Assassination Records constitutes  *"[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court*."[98]

96.     The APA requires that a court *"hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious… or otherwise not in accordance with law*."[99]

97.     Neither the JFK Act from which Defendant NARA derives its authority to administer the Act nor the APA authorizes Defendant to take action based on criteria not appearing in the Act or procedures that contravene the Act.

98.     Defendant NARA's implementation of the Biden Memoranda by withholding Assassination Records from disclosure is arbitrary, capricious and contrary to law because the Biden Memoranda violated the express terms of the Act and the redaction or withholding of Assassination Records in full is based on non-statutory criteria.

---

[96] 28 U.S.C. §1361.
[97] 5 U.S.C. § 551(1).
[98] Id. at § 704.
[99] Id. at § 706(2)(A).

99.     The Biden Memoranda direct Defendant NARA to exercise its authority in ways that are arbitrary and capricious, and contrary to the JFK Act in violation of the APA.[100]

100.    Defendant NARA cannot implement the Biden Memoranda without violating the JFK Act from which it derives its authority over Assassination Records and the APA.

101.    Plaintiffs and their members have no adequate remedy at law, and have and will suffer irreparable injury if Defendant NARA continues to comply with the Biden Memoranda.

102.    The public interest favors entry of an injunction barring Defendant NARA from implementing the Biden Memoranda that violated the express terms of JFK Act.  Implementation will result in unreasonable delay of the release of Assassination Records in contravention of Congress' express command for prompt disclosure.

103.    Because the Biden Memoranda direct agencies to violate the law and is contrary to congressional intent, this Court should declare that Defendant NARA's  implementation of the Biden Memoranda withholding assassination records is unlawful and enjoin Defendant NARA from continuing to implement the Biden Memoranda.

## FOURTH CAUSE OF ACTION
### (5 USC §701, et seq./mandamus re JFK Records Act)
### (As to Defendant NARA)

104.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

105.    Defendant NARA has ministerial non-discretionary duties pursuant to the JFK Act as follows:

---

[100] Id. at § 706.

35

a.      The JFK Records Act mandates that the JFK Collection **shall** include a central directory comprised of identification aids created for each record transmitted to Defendant NARA through the Archivist.[101]

b.      The JFK Records Act mandates that the JFK Collection **shall** be made available to the public.[102]

c.      The JFK Records Act mandates that all postponed or redacted Assassination Records **shall** be reviewed periodically by the originating agency and Defendant NARA acting through the Archivist consistent with the recommendations of the Review Board.[103]

d.      The JFK provides for periodic review for "additional assassination records."[104]

e.      The JFK Records Act mandates that all certifications to postpone Assassination Records **shall** be accompanied with an unclassified written description of the reason for such continued postponement. Such description **shall** be published in the Federal Register.[105]

f.      Upon information and belief, Defendant NARA has failed to complete the ARRB Compliance Program by seeking Final Declarations of Compliance from agencies that had not submitted these sworn statements to the ARRB.

g.      Upon information and belief, Defendant NARA has failed to follow-up with the outstanding Assassination Records search requests of the ARRB.

---

[101] 44 U.S.C. 2107 § 4(a)(2)(B).
[102] Id. at § 4(d)(1).
[103] Id. at § 5(g)(1).
[104] Id. at § 5(g)(2)(A).
[105] Id. at § 5(g)(2)(B).

36

106.     Defendant NARA must be enjoined from issuing any certification to Congress that all Assassination Records have been obtained and that all obligations under the JFK Act completed until Defendant NARA completes the outstanding Assassination Records searches requests to ensure that all Assassination Records have been provided by all the agencies.  Any certification made without such a search and review would be arbitrary and capricious, void and *ultra vires*.

107.     Defendant NARA has failed to perform its ministerial non-discretionary duties pursuant to the JFK Records Act as follows:

    a.     Defendant NARA has failed to perform to properly maintain the "central directory" of identification aids.

    b.     Defendant NARA has failed to ensure that all postponed Assassination Records determined to require continued postponement have an unclassified written description of the reason for such continued postponement as well as publishing the reasons for the postponement of each Assassination Record in the Federal Register upon such determination.

108.     Defendant NARA has the present ability to perform the above-described duties.

109.     Plaintiffs previously requested Defendant NARA to correct the deficiencies in the Collection and to complete the outstanding Assassination Records searches with no response.

**FIFTH CAUSE OF ACTION**
**(Violations of Federal Records Act)**
**(As to Defendant NARA)**

110.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

111.    The ARRB Final Report identified, *inter alia,* missing Assassination Records, disclosed the destruction of Assassination Records by certain agencies and failure of certain agencies to submit sworn  Final Statements of Compliance.

112.    Under the FRA, Defendant NARA acting through the Archivist has a ministerial non-discretionary duty to instruct the relevant agencies to conduct a reasonable search and review for missing or destroyed federal records.[106] When Defendant NARA becomes aware of missing or threatened unlawful destruction of records in the custody of an agency, Defendant NARA must notify the agency head in an attempt to recover such records. If the agency head refuses to pursue legal remedies, Defendant NARA **must** request that the Attorney General take action and must inform Congress that he has made this request.[107]

113.    The FRA also mandates that each agency head shall establish and maintain an active, continuing program for management of federal records[108] and shall establish safeguards against the removal or loss of records.[109]

114.    Upon information and belief, Defendant NARA has not followed up on the outstanding ARRB Assassination Records searches nor has requested the assistance of the Attorney General to complete these Assassination Record Searches as required by the FRA.

115.    Upon information and belief, Defendant NARA has not referred to the Attorney General for enforcement the destruction of Assassination Records by certain agencies identified by the ARRB as required by the FRA.

---

[106] 44 U.S.C. at §2115(b).
[107] Id.at  § 2905(a).
[108] Id. at  § 3102.
[109] Id. at  § 3105.

38

116.    The Plaintiffs  have a direct interest in ensuring that these records are maintained, preserved, and made accessible to the public in accordance with federal law.

117.    By failing to pursue the outstanding record searches and missing documents, Defendant NARA is violating its ministerial non-discretionary duty under  44 U.S.C. § 2905 to request that the Attorney General initiate action, or otherwise seek legal redress. The failure of Defendant NARA to perform these ministerial non-discretionary duties has harmed and continue to harm Plaintiffs by denying Plaintiffs access to these important historical documents and impairing the ability of Plaintiff MFF from carrying out its core mission.

118.    Plaintiffs are therefore entitled to relief in the form of a declaratory order that Defendant NARA is in violation of its statutory responsibility under 44 U.S.C. § 2905, and the issuance of an injunctive order compelling Defendant NARA to request that the Attorney General initiate action, or seek other legal redress, to recover these Assassination Records.

119.    Defendant NARA must be enjoined from certifying that all Assassination Records have been obtained until Defendant NARA through the Archivist makes the requisite showing that it has complied with its duties to ensure that all Assassination Records have been provided by all the relevant agencies.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

1.    Declare that the Biden Memoranda violates the JFK Records Act.

2.    Declare that the Biden Memoranda were issued *ultra vires by* unlawfully certifying the postponement of public disclosure of an undetermined number of unidentified Assassination Records.

3.     Declare that the Defendant President Biden acted arbitrarily and capriciously when he certified postponement of the Assassination Records in his Biden Memoranda and directed Defendant NARA comply with the Biden Memoranda.

4.     Declare that Defendant NARA acted arbitrary and capriciously when it complied with the unlawful Biden Memoranda by withholding Assassination Records from disclosure.

5.     Immediately, or as soon as the matter can be heard, issue an order compelling Defendants to comply with the JFK Records Act by doing the following:

a.     For each withheld Assassination Record, Defendant President Biden shall issue an unclassified explanation certification that specifies the reasons for continued postponement pursuant to Sections 5, 6 and 9 of the JFK Records Act;

b.     For each withheld Assassination Record, require Defendant President Biden to demonstrate using clear and convincing evidence the identifiable harm posed by the potential disclosure of such Assassination Record accompanied by an explanation of how the section 6 identifiable harm outweighs the public interest in disclosure. If the Court finds that the proposed grounds for postponement do not meet the statutory criteria. the Court should order the release of such Assassination Records to the American people;

c.     Defendant NARA shall initiate and complete a search for other Assassination Records whose identification aids do not appear in the central directory and then certify that such a search was complete;

d.     Defendant NARA shall remove all unjustified redactions from the Identification Aids in the central directory based on the declassification criteria of section 6 of the JFK Act;

e.      Defendant NARA shall conduct a new search based on the standards created by the JFK Records Act and the Federal Records Act for the missing Assassination Records identified in this complaint and to complete the outstanding search requests of the ARRB (set forth in paragraphs 53-54 and 60-66);

f.      Defendant NARA shall correct the deficiencies in the central directory (set forth in paragraphs 56-57) so that it includes all identification aids and ensure that all identification aids contain accurate notation of current release status (i.e., released in full, partially redacted, or withheld-in full);

g.      Defendant NARA shall complete the ARRB Compliance Program (set forth in paragraph 60);

h.      Defendant NARA shall verify that there are no additional Assassination Records withheld in full beyond the 520 Assassination Records withheld under Sections 10 and 11 of the Act by reviewing the records identified in paragraphs 58(a)-(c), and verify status to Plaintiffs;

i.      Defendant NARA shall establish a procedure pursuant to the JFK Records Act and the Federal Records Act to ensure the public release of all Assassination Records at the earliest possible date.

j.      Defendant NARA shall make the requisite showing that it has complied with its duties under the FRA to obtain missing or destroyed documents to ensure that all Assassination Records have been provided by all the relevant agencies.

k.      Defendant NARA shall be enjoined from any certification that "all Assassination Records" have been obtained until all of the above-described duties have been fully completed.

41

6.    Enter an order declaring pursuant to  28 USC 2201 that Defendants have failed to comply with their obligations under the JFK Act by continuing to withhold Assassination Records.

7.    Issue a peremptory writ of mandamus commanding Defendants to comply with the JFK Records Act.

8.    Award Plaintiffs' attorney's fees and the costs of this proceeding, pursuant to 28 U.S.C. § 2412(d).

9.    Expedite this action in every way pursuant to 28 U.S.C. § 1657(a).

10.   Award such other and further relief as the Court may deem just and proper.

Dated:  January 5, 2023


_____/s/_____
William M. Simpich
Attorney for Plaintiffs The Mary Ferrell Foundation, Inc., Josiah Thompson and Gary Aguilar

_____/s/_____
Lawrence Schnapf*
* pro hac vice

42