United States District Court
Northern District of California

1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9

10   MARY FERRELL FOUNDATION, INC.,          Case No. 22-cv-06176-RS
     et al.,

11                 Plaintiff,

12          v.                                **ORDER GRANTING IN PART AND
                                              DENYING IN PART MOTION TO
13   JOSEPH R. BIDEN, et al.,                 DISMISS AND DENYING
                                              PRELIMINARY INJUNCTION**
14                 Defendant.

15                              **I.   INTRODUCTION**

16          In this action, Plaintiffs, the Mary Ferrell Foundation, Josiah Thompson, and Gary Aguilar,

17   aver that Defendants, President Biden and the National Archives and Records Administration

18   ("NARA"), have failed to comply with the President John F. Kennedy Assassination Records

19   Collection Act of 1992 ("JFK Act"). Enacted to encourage transparency, the JFK Act requires,

20   subject to certain limitations, the disclosure of records related to the assassination of President

21   Kennedy. Because Defendants have continued to withhold some assassination records, Plaintiffs'

22   Second Amended Complaint ("SAC") asserts five claims: (1) an *ultra vires* claim for injunctive

23   and declaratory relief against President Biden; (2) a mandamus claim against President Biden; (3)

24   an Administrative Procedure Act ("APA") claim alleging arbitrary and capricious action by

25   NARA; (4) an APA/mandamus claim to compel NARA to take certain actions; and (5) a claim for

26   a declaratory judgment that NARA has violated the Federal Records Act. Plaintiffs have also

27   moved for a preliminary injunction, seeking (1) a declaration that NARA is the successor in

28   function to the Assassination Records Review Board ("ARRB"); (2) an order for NARA to

1   enforce a 1998 memorandum of understanding; (3) an order that NARA search for additional

2   assassination records; and (4) an order pausing implementation of Transparency Plans that were

3   detailed in Presidential memoranda. Defendants oppose, and have moved to dismiss all claims

4   under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

5        For the reasons set forth below, Defendants' motion to dismiss is granted except as to

6   portions of the APA/mandamus claim (Count Four) and the Federal Records Act claim (Count

7   Five), and Plaintiffs' motion for a preliminary injunction is denied.

8                              **II. BACKGROUND[1]**

9        The tragic assassination of President Kennedy on November 22, 1963, as he rode in a

10  motorcade through downtown Dallas, Texas, has understandably attracted widespread and

11  enduring public attention. In the immediate aftermath, several formal government investigations

12  were commenced, including those conducted by the Warren Commission, the Rockefeller

13  Commission, the Church Commission, and the House Select Committee on Assassinations.

14  Though those investigations concluded that Lee Harvey Oswald was the sole culprit responsible

15  for the assassination, historians and members of the public have continued to seek more

16  information about how such a tragedy could have occurred.

17       Acknowledging this public desire for information, Congress enacted the JFK Act in 1992,

18  which contemplated the creation of a collection of all records held by the federal government

19  related to President Kennedy's assassination ("assassination records") and sought to require the

20  "expeditious" disclosure of those records. JFK Act § 2(b)(2). The Act set a 25-year deadline for

21  disclosure of all assassination records, unless "continued postponement [of the record was] made

22  necessary by an identifiable harm to military defense, intelligence operations, or conduct of

23  foreign relations" that was "of such gravity that it outweigh[ed] the public interest in disclosure."

24  JFK Act § 5(g)(2)(D). To assist in this endeavor, the act established the Assassination Records

25  Review Board ("ARRB"), an independent agency tasked with reviewing requests to postpone the

26

27  ---
    [1] This section is based on the averments in the SAC, which must be taken as true for purposes of
    the motion to dismiss. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

28

release of assassination records. JFK Act § 7.

On October 26, 2017, the day of the 25-year deadline contemplated in the JFK Act, President Trump issued a memorandum exercising his authority to postpone the release of certain records pursuant to Section 5(g)(2)(D). President Trump issued an additional memorandum in April 2018 continuing postponement of certain records. After assuming office, President Biden issued three memoranda in October 2021, December 2022, and June 2023 (the "Biden Memoranda"[2]), again continuing postponement of certain records. The December 2022 and June 2023 memoranda authorized the use of Transparency Plans, which were plans created by each agency "to ensure that information would continue to be disclosed over time as the identified harm associated with release of the information dissipates." December 2022 Biden Memo[3] at 77,969.

Plaintiff Mary Ferrell Foundation is a non-profit organization that "maintains the largest searchable electronic collection of materials related to the JFK assassination." Dkt. 44 ("SAC") ¶ 15. Its website is "often the first place that researchers, authors and historians visit to search for" materials related to the assassination. *Id.* Members of the Mary Ferrell Foundation, including Plaintiffs Josiah Thompson and Gary Aguilar, "have long advocated for the preservation, declassification, and public availability of Assassination Records." *Id.* ¶¶ 16–18.

Defendant NARA is an independent agency, supervised by the Archivist of the United States, that preserves and makes publicly accessible certain federal government records. 44 U.S.C. § 2102.

### III. LEGAL STANDARD

#### A. Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's

---

[2] The June 2023 memorandum, issued after briefing was concluded, raises the same issues and largely adopts the same position as the December 2022 memorandum. The June 2023 memorandum therefore need not be separately addressed.

[3] Certifications Regarding Disclosure of Information in Certain Records Related to the Assassination of President John F. Kennedy, 87 Fed. Reg. 77967 (Dec. 15, 2022) ("December 2022 Biden Memo").

subject-matter jurisdiction over the asserted claims. The plaintiff bears the burden of proving jurisdiction at the time the action is commenced. *See Tosco Corp. v. Cmtys. for Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001), *overruled on other grounds by Hertz Corp. v. Friend*, 559 U.S. 77 (2010). A facial attack under Rule 12(b)(1) "asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). When considering this type of challenge, the court is required to "accept as true the allegations of the complaint." *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001).

### B. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim. A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged" under a cognizable legal theory. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (internal quotation marks and citation omitted). When evaluating such a motion, courts generally "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### IV. ANALYSIS

### A. Injunctive, Declaratory, and Mandamus Relief Against the President

In their first two counts, Plaintiffs seek injunctive, declaratory, and mandamus relief against the President. Defendants oppose, arguing that courts generally do not have jurisdiction to issue such relief against the President—or, alternatively, that even if jurisdiction is theoretically

United States District Court
Northern District of California

available as a general matter, it cannot be exercised here.

Defendants are correct that federal courts generally recognize that they lack jurisdiction to issue injunctive relief against the President. *See Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.), *vacated on mootness grounds*, 138 S. Ct. 377 (2017) ("Generally, we lack 'jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion))). A plurality of the Supreme Court has determined that such relief is "extraordinary" and should "raise[] judicial eyebrows." *Franklin*, 505 U.S. at 802. Courts apply this same standard to requests for mandamus relief against the President. *See, e.g.*, *Guerrero v. Clinton*, 157 F.3d 1190, 1191 n.2 (9th Cir. 1998) (applying *Franklin*'s standard for injunctive relief against the President to mandamus relief against the President). As a result, most courts have dismissed or otherwise rejected claims that seek injunctive relief against the President. *See, e.g.*, *Hawaii*, 859 F.3d at 788 (vacating injunction to the extent it ran against the President); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (affirming dismissal of claims for injunctive relief against the President because "courts do not have jurisdiction to enjoin him"); *Missouri v. Biden*, No. 3:22-CV-01213, 2023 WL 2578260, at *38 (W.D. La. Mar. 20, 2023) (dismissing claims for injunctive relief against the President because "relief against other federal officials would redress the Plaintiffs' alleged injuries"); *Juliana v. United States*, 339 F. Supp. 3d 1062, 1079 (D. Or. 2018), *rev'd and remanded on other grounds*, 947 F.3d 1159 (9th Cir. 2020) (dismissing claims for injunctive relief against the President because such relief was not "essential to redressability").

There are a few limited scenarios, however, where courts have declined to dismiss claims for injunctive relief against the President. A court may be able to require a president to perform a "purely 'ministerial' duty," *See Franklin*, 505 U.S. at 802 (quoting *Mississippi v. Johnson*, 4 Wall. 475, 498–499 (1867)), defined as "one in respect to which nothing is left to discretion." *Johnson*, 4 Wall. at 498. In other words, ministerial duties admit "no room for the exercise of judgment." *Id.* at 499. Accordingly, courts have sometimes declined to dismiss claims for injunctive relief where the President is claimed to violate only a ministerial duty. *See, e.g.*, *Saget v. Trump*, 375 F. Supp.

United States District Court
Northern District of California

3d 280, 335 (E.D.N.Y. 2019) (refusing to dismiss injunctive relief claim because "enjoining the President and other executive officials from violating the TPS statute is akin to performing a ministerial duty"). Presidential actions may also be reviewed for constitutionality, where there are "specific allegations regarding separation of powers," *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023), such as when "'the presidential action . . . independently violates' another statute." *Id.* at 1131 (quoting *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002)).

Even if "none of the authority cited by Defendants requires that the President be dismissed," *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 329 (D. Md. 2018), several factors counsel in favor of dismissing Plaintiffs' claims for injunctive and mandamus relief. First, if such relief is even available, enjoining the President would be "extraordinary." *See Franklin*, 505 U.S. at 802–03. Plaintiffs do not make any constitutional arguments to avoid this concern. *See Murphy*, 65 F.4th at 1130. Second, Plaintiffs have sued both the President and NARA, but an injunction on NARA alone would suffice in redressing the averred injuries caused by the implementation of the Biden Memoranda. *See Juliana*, 339 F. Supp. 3d at 1079.

Third, none of the averred duties are ministerial. Section 5(g)(2)(D) of the JFK Act provides the President with significant discretion to determine that postponement is "made necessary" by national security concerns. JFK Act § 5(g)(2)(D). It states, in relevant part:

> Each assassination record shall be publicly disclosed in full, and available in the Collection no later than the date that is 25 years after the date of enactment of this Act, unless the President certifies, as required by this Act, that—(i) continued postponement is made necessary by an identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations; and (ii) the identifiable harm is of such gravity that it outweighs the public interest in disclosure.

JFK Act § 5(g)(2)(D).

There is significant "room for the exercise of judgment" by the President here; accordingly, this is not a ministerial duty. *See Mississippi*, 4 Wall. at 499.

Finally, Plaintiffs' remaining arguments for injunctive relief are unavailing, as many of them assert obligations that are simply not imposed upon the President in the JFK Act. For

United States District Court
Northern District of California

instance, contrary to Plaintiffs' objections, Section 5(g)(2)(D)[4] does not require the President to certify, on a record-by-record basis, that the harm outweighs the public interest in disclosure; apply a clear and convincing evidence standard; or publish an unclassified description of those determinations. Similarly, the President's approval of the Transparency Plans is not, as Plaintiffs claim, a delegation of the President's authority to postpone the release of records—it is the Biden Memoranda themselves that postponed the release of each record; the Transparency Plans merely set forth when that postponement will end. Finally, although the JFK Act imposes a duty on the "originating agency" and the Archivist to perform periodic reviews of the postponed releases, JFK Act § 5(g)(1), it imposes no such duty on the President.[5]

As to declaratory relief, a federal court's jurisdiction is more unsettled. Prior to *Franklin*, which raised jurisdictional concerns with relief against the President, the D.C. Circuit issued a declaratory judgment against the President after determining mandamus relief was warranted to compel a "ministerial" duty. *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974). The subsequent *Franklin* plurality opinion did not address the availability of declaratory relief, but Justice Scalia opined in a concurrence that "we cannot issue a declaratory judgment against the President." *Franklin*, 505 U.S. at 827 (Scalia, J., concurring). Some courts have read *Franklin* to find that declaratory relief against the President is generally unavailable. *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 977 n.1 (D.C. Cir. 1996) ("Although the following discussion is couched in terms of our ability to grant injunctive relief against the President, similar considerations regarding a court's power to issue relief against the President himself apply to

---

[4] Plaintiffs argue that standards for the President's postponement authority are outlined in Sections 6 and 9(d), but those sections apply to postponement after an initial determination by the ARRB. Section 5(g)(2)(D) is a separate authority that applies after the end of the 25-year deadline and is the authority invoked by the President here.

[5] Plaintiffs also generally aver that the President violated 1 C.F.R. Part 19 by failing to seek concurrence by the Department of Justice for the Biden Memoranda. By its text, however, 1 C.F.R. § 19.2 imposes duties on subordinate executive officials and not the President. If the Attorney General or their designate disapproves of a proposed proclamation, the regulation provides that the proclamation "shall not thereafter be presented to the President unless it is accompanied by a statement of the reasons for such disapproval." 1 C.F.R. § 19.2(e).

1   Swan's request for a declaratory judgment."). Others, however, have either found to the contrary

2   or decided to let such claims for declaratory judgment survive motions to dismiss. *See, e.g.*, *Stone*

3   *v. Trump*, 400 F. Supp. 3d 317, 360 (D. Md. 2019). Nonetheless, no court has issued a declaratory

4   judgment against the President following *Franklin* after considering whether it presents a

5   jurisdictional issue, nor has any Circuit definitively considered the issue outside of *Swan*.

6         Yet the availability of declaratory relief against the President need not be resolved.

7   Plaintiffs' claims, which are predicated on requirements simply not imposed by the JFK Act, must

8   be dismissed. Section 5(g)(2)(D) only requires the President to certify that continued

9   postponement is "made necessary" by an "identifiable" national security harm "of such gravity

10  that it outweighs the public interest in disclosure." JFK Act § 5(g)(2)(D), which he did. Whether

11  President Biden considered additional factors in deciding to postpone release of records does not

12  render null his fulfillment of this obligation. Plaintiffs' remaining arguments for declaratory relief,

13  such as the President unlawfully delegating authority through approval of the Transparency Plans,

14  have been previously addressed and are without merit.

15        Since none of the actions challenged are ministerial, there is no jurisdiction to grant

16  injunctive or mandamus relief against the President here. Nor do Plaintiffs state a claim for

17  declaratory relief. Because these are failures of law and any amendment would be futile, Counts 1

18  and 2 are dismissed without leave to amend.

19        **B.  Arbitrary and Capricious Action**

20        Plaintiffs aver that NARA has acted arbitrarily and capriciously in violation of the APA. 5

21  U.S.C. § 706(2)(A). Specifically, Plaintiffs challenge NARA's (1) issuance of a guidance

22  document in October 2017 to federal agencies titled in part "Procedures for Processing Remaining

23  Postponed Records"; (2) recommendation in 2017 and again in 2021 that the President temporarily

24  postpone release of certain records; (3) advising the President in March 2018 that it concurred

25  with agency requests for continued postponement; (4) review and approval of the use of

26  Transparency Plans; (5) pattern and practice of refusing to look for documents and suggesting that

27  researchers file Freedom of Information Act requests; and (6) implementation of the Biden

28

United States District Court
Northern District of California

1   Memoranda by withholding or redacting records.

2          To be reviewable under the APA, a challenged act or decision must constitute "final

3   agency action." 5 U.S.C. § 704. Finality requires the satisfaction of two conditions: "[f]irst, the

4   action must mark the 'consummation' of the agency's decision-making process"; and "second, the

5   action must be one by which 'rights or obligations have been determined,' or from which 'legal

6   consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). A challenged action

7   must also be "discrete"; a plaintiff cannot bring a "broad programmatic attack" on agency

8   practices. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). A plaintiff must therefore

9   "direct its attack against some *particular* 'agency action' that causes it harm." *Whitewater Draw*

10  *Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1010 (9th Cir. 2021) (quoting *Lujan v.*

11  *Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)).

12         None of the first four challenged actions—NARA's guidance document, presidential

13  recommendations, concurrence with continued postponement requests, and Transparency Plan

14  review—constitute final agency action. *Franklin* is instructive: in evaluating a challenge to the

15  apportionment of seats in the House of Representatives, the Supreme Court held that the report by

16  the Secretary of Commerce to the President, which tabulated state populations from the decennial

17  census, was not final agency action because it carried "no direct consequences for the

18  reapportionment." 505 U.S. at 798. Instead, the report served "more like a tentative

19  recommendation than a final and binding determination," and like "the ruling of a subordinate

20  official," was therefore "not final" and not subject to review under the APA. *Id.* (quoting *Abbott*

21  *Lab'ys v. Gardner*, 387 U.S. 136, 151 (1967)). Just as the President retained authority to determine

22  population figures in *Franklin* despite the Secretary's report, so too did the President retain

23  authority to authorize postponement despite NARA's guidance and advice. *See id.*, JFK Act §

24  5(g)(2)(D). Even if NARA's "tentative recommendation[s]" informed the President's decision, *see*

25  *id.*, it was ultimately the President who possessed the authority to postpone disclosure—and the

26  President's decision, not NARA's recommendations, created the legal consequences of postponing

27  the release of the records at issue. Accordingly, NARA's actions here do not constitute final

28

United States District Court
Northern District of California

1    agency action.

2            The fifth challenged action, NARA's pattern and practice of refusing to look for

3    documents under the JFK Act, is not a discrete agency action. An APA claim cannot seek the

4    "*wholesale* improvement of [a] program by court decree." *Lujan*, 497 U.S. at 891. For this reason,

5    averring a pattern and practice is generally insufficient to state a claim under the APA. *See, e.g.*,

6    *Californians for Renewable Energy v. United States Env't Prot. Agency*, No. C 15-3292 SBA,

7    2018 WL 1586211, at *19–*20 (N.D. Cal. Mar. 30, 2018). While Plaintiffs outline examples of

8    NARA failing to search for documents under the JFK Act, Plaintiffs make clear that they are

9    challenging a pattern and practice of NARA, not NARA's actions in any individual instance.

10   Therefore, Plaintiffs are not challenging a discrete agency action.[6]

11           By contrast, the sixth challenged action—NARA's withholding of the postponed records—

12   *is* a discrete final agency action, but Plaintiffs fail to plead adequately it is arbitrary and capricious.

13   As discussed regarding Count 1, Section 5(g)(2)(D) gives the President substantial discretion in

14   determining whether continued postponement of records disclosure is appropriate. The President

15   exercised that discretion in accordance with the JFK Act. The December 2022 memorandum, for

16   instance, certified "that continued postponement of public disclosure of these records is necessary

17   to protect against an identifiable harm to the military defense, intelligence operations, law

18   enforcement, or the conduct of foreign relations that is of such gravity that it outweighs the public

19   interest in disclosure," pursuant to the statutory criteria in Section 5(g)(2)(D). December 2022

20   Biden Memo at 77,968. The President was well within his discretion to consider other factors so

21   long as he certified the Section 5(g)(2)(D) factors were present, which he did. Accordingly,

22   NARA is not acting arbitrarily and capriciously by implementing the Biden Memoranda.

23           Since Plaintiffs' challenged actions are neither reviewable under the APA nor arbitrary and

24   capricious, Count 3 is dismissed.

25   _____

26   [6] Plaintiffs' allegations might alternatively sustain a claim under 5 U.S.C. § 706(1), seeking to
     "compel agency action unlawfully withheld or unreasonably delayed." Even if so styled, however,
27   this challenge would also fail. A discrete agency action is required "whether couched as a
     challenge to an agency's action or 'failure to act.'" *Whitewater*, 5 F.4th at 1010–11.

28

1      **C.  Compel Agency Action/Mandamus**

2          Plaintiffs bring a claim under the APA and mandamus statute to compel NARA to perform

3      its ministerial and non-discretionary duties to: (1) seek "Final Declarations of Compliance" from

4      agencies that failed to submit such declarations to the ARRB; (2) follow up on outstanding ARRB

5      search requests; (3) maintain an accurate index to the assassination records collection and central

6      directory of identification aids; (4) ensure all postponed assassination records have an unclassified

7      written description of the reasons for postponement; and (5) release, at the 25-year deadline in

8      2017, all records originated by the legislative branch.

9          Under the APA, a court can "compel agency action unlawfully withheld or unreasonably

10     delayed." 5 U.S.C. § 706(1). A § 706(1) claim can proceed only where a plaintiff "asserts that an

11     agency failed to take a *discrete* agency action that it is *required to take.*" *Norton*, 542 U.S. at 64;

12     *see also Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010)

13     (describing the obligation as "legally *required*—in the sense that the agency's legal obligation is . .

14     . clearly set forth" (citing *Norton*, 542 U.S. at 63)). Therefore, a court can only compel action

15     under § 706(1) if "there is 'a specific, unequivocal command' placed on the agency to take a

16     'discrete agency action,' and the agency has failed to take that action." *Plaskett v. Wormuth*, 18

17     F.4th 1072, 1082 (9th Cir. 2021) (citation omitted). Courts consider § 706(1) and mandamus

18     claims together since they have "mirror[ed]" requirements and "the relief sought is essentially the

19     same." *Id.* at 1081 (citation omitted).

20          Plaintiffs challenge NARA's failure to maintain accurate reference aids to the

21     assassination record collection, averring numerous inaccuracies in the central directory and

22     identification aids. The JFK Act required NARA to create a "uniform system" of identification

23     aids, JFK Act § 5(d)(1), publish a central directory of identification aids "for each record

24     transmitted to the Archivist," JFK Act § 4(a)(2)(B), and publish a subject guidebook and index to

25     the records collection, JFK Act § 4(a)(1). Among other inaccuracies, Plaintiffs aver that the central

26

27

28                                              ORDER ON MOTION TO DISMISS & PRELIMINARY INJUNCTION
                                                CASE NO. 22-cv-06176-RS

United States District Court
Northern District of California

1    directory is missing "more than 500 of the records made available online by NARA," SAC ¶ 94,[7]

2    despite the fact that the JFK Act specifically commanded NARA to include identification aids "for

3    each" record in the collection. Accordingly, Plaintiffs have stated a plausible claim for relief under

4    § 706(1) with respect to NARA's maintenance of the reference aids.

5            Likewise, Plaintiffs' challenge to NARA's failure to release all legislative branch records

6    in 2017 also has merit, since the Presidential authority claimed for the postponements seems

7    limited to records originated by the executive branch. The language and structure of Section 9

8    support this conclusion. Section 9(c)(4)(B) provides that after the ARRB makes its determination

9    as to whether an assassination record should be publicly disclosed, it should notice the President

10   for "determinations regarding executive branch assassination records," and "the [Congressional]

11   oversight committees . . . in the case of legislative branch records." Section 9(d)(1) imbues the

12   President with the "sole and nondelegable authority to require the disclosure or postponement" of

13   records that are either: (1) "an executive branch assassination record" or (2) "information

14   contained in an assassination record, obtained or developed solely within the executive branch,"

15   but no others. This siloed structure—requiring notification to the executive and legislative bodies,

16   respectively, and cabining the President's ability to override the ARRB's determinations regarding

17   postponement to executive branch records—comports with basic separation of powers principles.

18   Moreover, the interpretation that the President's postponement authority in Section 5(g)(2)(D) is

19   limited to executive branch records is also bolstered by the JFK Act's legislative history. The

20   Senate committee report on the Act clearly stated that the President's ability to postpone release of

21   records after 25 years only applied "in the case of executive branch records." S. Rep. 102-328, at

22   19, 1992 U.S.C.C.A.N. 2965, 2967; *see id.* (requiring Congressional resolutions in the event

23   Congress disagrees with ARRB determinations "for congressional records").[8]

24   _____

25   [7] As of June 6, 2023, the central directory appears to be "currently down for maintenance" and
     instead displays "a recent export of the information in the system," described as current as of May
26   17, 2021, or over two years ago. *JFK Assassination Collection Reference System*, The U.S.
     National Archives and Records Administration, https://www.archives.gov/research/jfk/search.

27   [8] Though the Act's language was changed by a technical amendment after being reported out of
     committee, the technical amendment only changed Section 5(g) by adding another identifiable

28

1

2

3

4

5

6

7

8

9

10

11

Many of Plaintiffs' remaining arguments rest on the notion that NARA, having published in the Federal Register that it is the "successor in function" to the ARRB, assumes all legal duties erstwhile tasked to the ARRB. This proposition is without merit.[9] NARA and the ARRB are two distinct entities, separately referenced in the JFK Act and tasked with separate statutory functions. Importantly, Congress specifically and explicitly expressed that ARRB obligations would cease when the ARRB itself terminated. JFK Act § 12(a) ("The provisions of this Act that pertain to the appointment and operation of the Review Board shall cease to be effective when the Review Board and the terms of its members have terminated pursuant to section 7(o)."). Neither NARA nor any other executive agency can, by its own ipse dixit, legally assume obligations so terminated by Congress. The memorandum of understanding signed by the CIA, ARRB, and NARA in 1998 does not change this, as it did not impose any specific responsibilities upon NARA.

12

13

14

15

16

17

18

19

20

21

22

23

Yet even assuming, as Plaintiffs wish, that NARA were the "successor in function" to the ARRB, Plaintiffs' remaining arguments still fail. The JFK Act imposes no "specific, unequivocal command" to undertake the remaining averred duties (seeking "Final Declarations of Compliance," following up on outstanding search requests, and ensuring postponement decisions are explained in an unclassified statement). First, the JFK Act never mentions declarations of compliance. Therefore, though Plaintiffs aver the ARRB "initiated" a program to collect declarations of compliance, SAC ¶ 43, the compliance program was one of many ways the ARRB could have carried out its obligation to "direct that all assassination records be transmitted to the Archivist." JFK Act § 9(c)(1). The ARRB accordingly could not have been "specific[ally]" commanded to implement this voluntary program. *See Plaskett*, 18 F.4th at 1082. Second, while the JFK Act required an unclassified written description of the reasons for continued postponement to be "provided to the Archivist" and "published in the Federal Register," JFK Act

24

25

26

27

harm that the President could certify was present for continued postponement. 138 Cong. Rec. S10360-01, S10361.

[9] As Defendant explains, NARA's "successor in function" statement helped explain "why it was appropriate for NARA to issue the final rule … transferr[ing] regulations from one chapter of the Code of Federal Regulations to another." Dkt. 58 at 20.

28

United States District Court
Northern District of California

§ 5(g)(2)(B), it did so in the context of "periodic review[s]," JFK Act § 5(g)(2)(A). The President's power further to postpone record releases is described in a subsequent provision, JFK Act § 5(g)(2)(D), which was a power seemingly meant to conclude the periodic review process described in Sections 5(g)(2)(A)–(C). It would therefore make little sense for Sections 5(g)(2)(A)–(C) to modify the President's power under Section 5(g)(2)(D). Since NARA has no "specific, unequivocal command" to take the described actions, Plaintiffs fail to state a § 706(1) or mandamus claim with respect to these actions. *See Plaskett*, 18 F.4th at 1082. Accordingly, Count 4 is dismissed except to the extent it challenges NARA's failure to maintain accurate reference aids and to release the legislative records.

### D. Federal Records Act

Plaintiffs plead that NARA has violated the Federal Records Act by failing to request that the Attorney General take action after the ARRB identified destruction of assassination records by certain agencies. Under the Federal Records Act, if the Archivist becomes aware of "any actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of" an agency, they are required to notify that agency's head and assist them "in initiating action through the Attorney General for the recovery of records unlawfully removed and for other redress provided by law." 44 U.S.C. § 2905(a). If the agency head "does not initiate an action for such recovery or other redress within a reasonable period of time after being notified of any such unlawful action," the Archivist must "request the Attorney General to initiate such an action." *Id.* Plaintiffs aver that the ARRB Final Report identified intentional destruction of records by the CIA, FBI, and Secret Service, SAC ¶ 61(f), thus triggering the Archivist's duty to ask the Attorney General to initiate an action for their recovery.

Defendants argue this count should be dismissed because a referral to the Attorney General is only required under § 2905(a) for the recovery of records unlawfully *removed*, rather than *destroyed*. Defendants cite several cases interpreting an analogous provision to § 2905(a)—44 U.S.C. § 3106(a), which governs federal agencies—holding that agencies only have a duty to involve the Attorney General when records have been unlawfully removed. *See, e.g., Bioscience*

*Advisors, Inc. v. United States Sec. & Exch. Comm'n,* No. 21-CV-00866-HSG, 2023 WL 163144, at *6 (N.D. Cal. Jan. 11, 2023); *Citizens for Resp. & Ethics in Washington v. U.S. S.E.C.*, 916 F. Supp. 2d 141, 146–148 (D.D.C. 2013).

However, Defendants fail to contend with the differences in language between § 2905(a) and § 3106(a). While § 3106(a) only requires an agency head to "initiate action through the Attorney General for the recovery of records the head of the Federal agency knows or has reason to believe have been unlawfully removed," § 2905(a) requires the Archivist to assist an agency head in "initiating action through the Attorney General for the recovery of records unlawfully removed *and for other redress provided by law*." 44 U.S.C. §§ 2905(a), 3106(a) (emphasis added). Likewise, if the agency head fails to "initiate an action for such recovery or other redress" after being notified of "*any such unlawful action*," the Archivist must request the Attorney General to initiate such action. 44 U.S.C. § 2905(a) (emphasis added). In other words, as compared with § 3106(a), § 2905(a) includes an additional clause enabling the Archivist to initiate action through the Attorney General. § 2905(a) thereby seems to impose a broader referral duty on the Archivist than § 3106(a) imposes on agency heads because of its inclusion of "other redress provided by law." Such a distinction also seems to be made within § 3106. *Compare* 44 U.S.C. § 3106(a) (requiring agency heads to take action for "the recovery of records . . . unlawfully removed") *with* § 3106(b) (requiring the Archivist to make a referral when an agency head fails to "initiate an action for such recovery or other redress" after notification of "any such unlawful action described in subsection (a)").

The legislative history of § 2905 and § 3106 supports this interpretation. In 1984, Congress amended § 2905 and § 3106 to require an Attorney General referral by the Archivist if an agency head failed to take action. The House committee report only discusses the provision in the context of initiating action for the "recovery of records unlawfully removed." H.R. Rep. 98-707, at 21. By contrast, the final conference report explained the provision as requiring the Archivist to make a referral to the Attorney General if they are aware of "any such unlawful action," where "destruction" was listed several sentences before as one action prohibited by law. H.R. Conf. Rep.

United States District Court
Northern District of California

1    98-1124, at 27, *as reprinted in* 1984 U.S.C.C.A.N. 3894, 3902. The conference report then

2    explained that Congress would be notified in such instances "because of the frequency of incidents

3    of removal *or destruction*." *Id.* at 28 (emphasis added).[10]

4           Because the language of § 2905(a) and § 3106(a) are markedly different, Defendants'

5    references to cases interpreting § 3106(a) are not persuasive. § 3106(a) seems to require the

6    Archivist to make an Attorney General referral in more circumstances than unlawful removal of

7    records. It instead seems to require that the Archivist make a referral to the Attorney General if the

8    agency head has failed to act and the Archivist is aware of, among other unlawful conduct,

9    destruction of agency records. Plaintiffs aver that certain agencies intentionally destroyed records,

10   these agencies' destruction of records was reported in the ARRB final report, and both the

11   Archivist and the agencies failed to refer the matter to the Attorney General, thereby stating a

12   plausible claim. Accordingly, the motion to dismiss Count 5 is denied, except to the extent it

13   references NARA's failure to pursue outstanding record searches.[11]

14          **E.  Preliminary Injunction**

15          In order to obtain preliminary injunctive relief, a plaintiff must demonstrate that: (1) it is

16   likely to succeed on the merits; (2) it is likely to suffer irreparable injury; (3) that the balance of

17   hardships tips in its favor; and (4) that an injunction is in the public interest. *See Winter v. Nat.*

18   *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As the Ninth Circuit has directed courts to evaluate

19   the likelihood of success on a sliding scale, a preliminary injunction may be granted where the

20   plaintiff establishes that serious questions on the merits exist and the balance of hardships tips

21   sharply in its favor. *See Alliance for the Wild Rockies v. Cottrell*, 613 F.3d 960, 968 (9th Cir.

22   2010). The plaintiff also must demonstrate a likelihood of irreparable harm and that the public

23

24   ───────────────

[10] The conference report adopted the House version of § 2905, so no legislative text changed
25   between the committee report and the conference report.

26   [11] Though Plaintiffs in this claim seek a declaration that NARA violated the Federal Records Act
     by failing to pursue the outstanding record searches of the ARRB, the Federal Records Act
27   imposes no independent obligation on NARA to complete those searches. As in Count 4, Plaintiffs
     fail to state a claim regarding the outstanding record searches.

28
                                              ORDER ON MOTION TO DISMISS & PRELIMINARY INJUNCTION
                                              CASE NO. 22-cv-06176-RS

1  interest favors granting the injunction. *Id.*

2       Plaintiffs have failed to demonstrate either a likelihood of irreparable harm or that they are

3  likely to succeed on the merits. Plaintiffs waited years after President Trump's first postponement

4  memorandum in 2017 to file suit and did not move for a preliminary injunction until several

5  months later. Moreover, the Transparency Plans that Plaintiffs contend came into effect on July 1,

6  2023, have actually "been in effect since December 15, 2022." Dkt. 61 at 8. Plaintiffs accordingly

7  do not show a likelihood of irreparable harm. Since the motion for a preliminary injunction relies

8  upon several arguments that were earlier rejected—NARA's failure to follow up on outstanding

9  record searches, status as a "successor in function" to the ARRB, and implementation of the

10  Transparency Plans—Plaintiffs have also failed to show they are likely to succeed on the merits.

11  Therefore, the motion for preliminary injunction is denied.

## V.  CONCLUSION

13       For the reasons articulated above, Defendants' motion to dismiss is granted except as to the

14  portions of Count 4 relating to release of legislative records and maintenance of certain reference

15  aids, and the portion of Count 5 averring a failure to refer destruction of records to the Attorney

16  General. Plaintiffs' motion for a preliminary injunction is also denied.

18  **IT IS SO ORDERED**.

20  Dated: July 14, 2023

22  RICHARD SEEBORG
Chief United States District Judge

United States District Court
Northern District of California