1    BRIAN M. BOYNTON
     Principal Deputy Assistant Attorney General
2    ELIZABETH J. SHAPIRO
     Deputy Branch Director
3    M. ANDREW ZEE (CA Bar No. 272510)
     JOHN ROBINSON (DC Bar No. 1044072)
4    Attorneys
     Civil Division, Federal Programs Branch
5    U.S. Department of Justice
     450 Golden Gate Avenue, Room 7-5395
6    San Francisco, CA 94102
     Telephone: (415) 436-6646
7    E-mail: m.andrew.zee@usdoj.gov

8    *Attorneys for Defendants*

9

10              **UNITED STATES DISTRICT COURT**
              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
11

12
     THE MARY FERRELL FOUNDATION,
13   INC.; JOSIAH THOMPSON; and GARY
     AGUILAR,                                    No. 3:22-cv-06176-RS
14

15              Plaintiffs,                      **DEFENDANTS' NOTICE OF MOTION
                                                FOR PARTIAL SUMMARY JUDGMENT;
16      v.                                      MEMORANDUM OF POINTS AND
                                                AUTHORITIES IN SUPPORT THEREOF**
17   NATIONAL ARCHIVES AND RECORDS
     ADMINISTRATION,                            Hearing Date: January 9, 2025
18                                              Time: 1:30 p.m.
                Defendant.                      Judge: Hon. Richard Seeborg
19

20

21

22

23

24

# TABLE OF CONTENTS

NOTICE OF MOTION ................................................................................................ 1

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 2

    A.    Statutory and Factual Background ................................................................ 2

    B.    Procedural History ....................................................................................... 3

ARGUMENT .............................................................................................................. 6

I.    NARA IS ENTITLED TO JUDGMENT ON PLAINTIFFS' CLAIM TO
COMPEL NARA TO RELEASE THE LEGISLATIVE RECORDS ............................... 6

    A.    The President's Postponement Authority Applies to All "Assassination
Records" ....................................................................................................... 6

    B.    The President Only Postponed the Release of Information That Originated
in the Executive Branch .............................................................................. 11

II.    DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFFS'
FEDERAL RECORDS ACT CLAIM ......................................................................... 12

    A.    Plaintiffs Lack Standing to Assert a Federal Records Act Claim .................. 13

    B.    Plaintiffs' Federal Records Act Claim Fails As a Matter of Law .................. 16

        1.    Plaintiffs Lack a Cause of Action ........................................... 17

        2.    Section 2905's Referral Obligation Does Not Extend to
Documents Allegedly Destroyed (as Opposed to Documents
Unlawfully Removed) ............................................................ 18

        3.    In the Alternative, NARA Is Entitled to Summary Judgment
Because the FRA Does Not Require a Referral to the Attorney
General in these Circumstances ............................................. 21

CONCLUSION ....................................................................................................... 22

i

Defs.' Mot. for Partial Summ. J.
Case No. 3:22-cv-06176-RS

1

**TABLE OF AUTHORITIES**

2

<u>**Cases**</u>

3

*ACLU of Fla. v. ICE*,
No. 1:22-cv-01129 (CJN), 2023 WL 6461053 (D.D.C. Aug. 31, 2023) ........................... 14, 16

4

*Am. First Legal Found. v. Becerra*,
No. CV 24-1092 (RC), 2024 WL 3741402, (D.D.C. Aug. 9, 2024) ........................................ 18

5

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991) ............................................................................................ 17

6

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) .......................................................................................................... 9

7

8

*Cause of Action Inst. v. Pompeo*,
319 F. Supp. 3d 230 (D.D.C. 2018) ............................................................................... 13, 15

9

*Citizens for Resp. & Ethics in Wash. v. SEC*,
916 F. Supp. 2d 141 (D.D.C. 2013) .................................................................. 14, 18, 19, 20

10

11

*Citizens for Resp. & Ethics in Washington v. DHS*,
592 F. Supp. 2d 111 (D.D.C. 2009), *appeal dismissed*, No. 09-5014,
2009 WL 4250490 (D.C. Cir. Nov. 13, 2009) ..................................................................... 17

12

13

*Crowell v. Benson*,
285 U.S. 22 (1932) ............................................................................................................... 20

14

*Demery v. Arpaio*,
378 F.3d 1020 (9th Cir. 2004) ............................................................................................. 15

15

16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ............................................................................................................. 15

17

*G & M, Inc. v. Newbern*,
488 F.2d 742 (9th Cir. 1973) ................................................................................................. 5

18

19

*Jennings v. Rodriguez*,
138 S.Ct. 830 (2018) ............................................................................................................ 20

20

*Kissinger v. Reps. Comm. for Freedom of the Press*,
445 U.S. 136 (1980) ............................................................................................................. 17

21

22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................................................................................................... 13, 15

23

24

ii

*Mary Ferrell Found., Inc. v. Biden*,
    No. 22-CV-06176-RS, 2023 WL 4551066 (N.D. Cal. July 14, 2023) ............................. *passim*

*Mary Ferrell Found., Inc. v. NARA*,
    No. 22-CV-06176-RS, 2024 WL 202975 (N.D. Cal. Jan. 18, 2024)................................. *passim*

*M.S. v. Brown*,
    902 F.3d 1076 (9th Cir. 2018) ............................................................................................ 13

*Paul Revere Ins. Grp. v. United States*,
    500 F.3d 957 (9th Cir. 2007) ................................................................................................ 9

*Plaskett v. Wormuth*,
    18 F.4th 1072 (9th Cir. 2021) ............................................................................................ 17

*Project on Gov't Oversight, Inc. v. NARA*, No. 23-CV-2564 (DLF),
    No. 23-CV-2564 (DLF), 2024 WL 4286109 (D.D.C. Sept. 25, 2024)................................... 18

*Raines v. Byrd*,
    521 U.S. 811 (1997).......................................................................................................... 13

*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009) ................................................................................................ 7

*SEC v. Fed. Lab. Rels. Auth.*,
    568 F.3d 990 (D.C. Cir. 2009) ........................................................................................... 20

*Stenberg v. Carhart*,
    530 U.S. 914 (2000)............................................................................................................ 7

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .......................................................................................................... 13

*United States v. Lopez*,
    998 F.3d 431 (9th Cir. 2021), *reh'g en banc denied*, 58 F.4th 1108 (9th Cir. 2023) ................. 9

*United States v. Red Lake Band of Chippewa Indians*,
    827 F.2d 380 (8th Cir. 1987) .............................................................................................. 19

*United States v. Thomsen*,
    830 F.3d 1049 (9th Cir. 2016) .............................................................................................. 9

*Washington Env't Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ................................................................................... 13, 15

## **Statutes**

44 U.S.C. § 2107.................................................................................................................... 2

iii

44 U.S.C. § 2905 ................................................................................... *passim*

44 U.S.C. § 3106(a) ........................................................................................... 18

Federal Records Act of 1950,
    Pub. L. No. 81-754, § 505(b), 64 Stat. 578, 585 (1950) ......................................... 20

President John F. Kennedy Assassination Records Collection Act of 1992,
    Pub. L. No. 102-526, 106 Stat. 3443 (1992) .......................................... *passim*

**Regulations**

Temporary Certification for Certain Records Related to the Assassination
of President John F. Kennedy*,*
    82 Fed. Reg. 50,307 (Oct. 26, 2017).......................................................................... 2

Certification for Certain Records Related to the Assassination of President John F. Kennedy,
    83 Fed. Reg. 19,157 (April 26,2018) .......................................................................... 3

Temporary Certification Regarding Disclosure of Information in Certain Records
Related to the Assassination of President John F. Kennedy,
    86 Fed. Reg. 59,599 (Oct. 22, 2021) .......................................................................... 3

Certifications Regarding Disclosure of Information in Certain Records Related to the
Assassination of President John F. Kennedy,
    87 Fed. Reg. 77,967 (Dec. 15, 2022) .......................................................................... 3

Certification Regarding Disclosure of Information in Certain Records Related to the
    Assassination of President John F. Kennedy,
    88 Fed. Reg. 43,247 (June 30, 2023) .......................................................................... 3

**Legislative Materials**

H.R. Rep. No. 98-707 (1984)........................................................................................ 21

H.R. Rep. No. 98-1124, (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3894, 3902 (Conf. Rep.)... 21

S. Rep. No. 102-328, (1992), *as reprinted in* 1992 U.S.C.C.A.N. 2965, 2967 .................... 10, 11

**Other Authorities**

Assassination Records Review Board, Final Report of the Assassination Records Review Board,
    https://perma.cc/F42P-DP7G ................................................................................ 14, 16

National Archives, JFK Assassination Records – 2023 Additional
Documents Released,
    https://perma.cc/KP7D-QVFM ................................................................................ 3

iv

National Archives, Press Release, National Archives Releases New Group of JFK Assassination
Documents (Dec. 15, 2022)
    https://perma.cc/4YEA-KQ4P ................................................................................................. 3

Defs.' Mot. for Partial Summ. J.
Case No. 3:22-cv-06176-RS

1

**NOTICE OF MOTION**

2      PLEASE TAKE NOTICE that Defendants, by and through their counsel, hereby move

3 for partial summary judgment for the reasons set forth below.

4

**INTRODUCTION**

5      After much amendment of the pleadings, this Court has narrowed this case to three

6 remaining claims.  At this juncture, Defendant NARA is entitled to summary judgment on two of

7 those claims.  First, Plaintiffs' request under the APA for an order compelling NARA to release

8 the so-called "legislative records" fails both on the law and the on the facts.  It fails on the law

9 because the JFK Act authorizes the President to postpone *all* assassination records, not just those

10 of the Executive Branch.  That conclusion is supported by the plain text of the Act's

11 postponement provision, and by the overall structure and logic of the Act.  And, on the facts,

12 NARA is entitled to judgment because all of the information that has been postponed in the

13 legislative records is information that originated in the Executive Branch, which the Act

14 expressly recognizes is under the President's control.

15      Second, Plaintiffs' claim relying on the Federal Records Act and seeking to compel

16 NARA to make a referral to the Attorney General for allegedly destroyed records likewise fails

17 for jurisdictional reasons and on its merits.  Even assuming the existence of a viable cause of

18 action, Plaintiffs' asserted injuries are not redressable because NARA has attested that the

19 records at issue were irrevocably destroyed three decades ago.  In 1994, pursuant to an approved

20 records schedule, those records were "pulped" and converted to new paper products.  There is

21 thus nothing this Court could order that would redress Plaintiffs' asserted injuries.  And on the

22 merits, Plaintiffs' FRA claim would in any event fail.  That is because (1) there is no cause of

23 action under the FRA; (2) the plain text of the FRA, 44 U.S.C. § 2905(a), does not require a

24

1

referral to the Attorney General for allegedly destroyed records; and (3) even if the text could be read otherwise, there is no basis to require referral under these circumstances, where the records at issue have long since become irrecoverable.

NARA is accordingly entitled to partial summary judgment on these two claims.

## BACKGROUND

### A.    Statutory and Factual Background

"The factual history of this suit has been extensively reviewed previously" by the Court. *Mary Ferrell Found., Inc. v. NARA*, No. 22-CV-06176-RS, 2024 WL 202975, at *1 (N.D. Cal. Jan. 18, 2024) ("*MFF II*"); *see also Mary Ferrell Found., Inc. v. Biden*, No. 22-CV-06176-RS, 2023 WL 4551066, at *1–2 (N.D. Cal. July 14, 2023) ("*MFF I*").  In 1992, Congress passed the JFK Act to establish a process for the collection, review, and disclosure of records related to the assassination of President John F. Kennedy.  *See* President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, 106 Stat. 3443 (1992) ("JFK Act") (codified at 44 U.S.C. § 2107 note).  The Act set a 25-year deadline for disclosure of all assassination records, unless the President certified that "continued postponement [of disclosure was] made necessary by an identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations" that was "of such gravity that it outweigh[ed] the public interest in disclosure." *Id.* § 5(g)(2)(D)(i), (ii).

In 2017, on the eve of the 25-year deadline, then-President Trump issued a memorandum exercising his authority to postpone the release of certain records pursuant to Section 5(g)(2)(D) of the Act.  *See* Temporary Certification for Certain Records Related to the Assassination of President John F. Kennedy*, 82 Fed. Reg. 50,307 (Oct. 26, 2017).  In the ensuing years, there have been four additional presidential postponements, including most recently by President

Defs.' Mot. for Partial Summ. J.
Case No. 3:22-cv-06176-RS

Biden in June 2023 (the "6/30/23 Memo").  *See* ECF No. 65-1, Ex. A, Certification for Certain Records Related to the Assassination of President John F. Kennedy, 83 Fed. Reg. 19,157 (Apr. 26, 2018); Temporary Certification Regarding Disclosure of Information in Certain Records Related to the Assassination of President John F. Kennedy, 86 Fed. Reg. 59,599 (Oct. 22, 2021); Certifications Regarding Disclosure of Information in Certain Records Related to the Assassination of President John F. Kennedy, 87 Fed. Reg. 77,967 (Dec. 15, 2022); Certification Regarding Disclosure of Information in Certain Records Related to the Assassination of President John F. Kennedy, 88 Fed. Reg. 43,247 (June 30, 2023).  NARA has now released all assassination records subject to Section 5(g)(2)(D) in full or in part.[1]  The collection now consists of approximately five million pages.[2]

The President's June 2023 memorandum was his "final certification" under the JFK Act. 6/30/23 Memo § 1.  The President certified that further postponement of certain redacted information was necessary and directed that future releases of these postponed records would occur consistent with "Transparency Plans" prepared by federal agencies.  *Id.* §§ 3, 5.  The Transparency Plans "detail[] the event-based or circumstance-based conditions that will trigger the public disclosure of currently postponed information by the National Declassification Center (NDC) at NARA."  *Id.* § 5.

### B.    Procedural History

In October 2022, the Mary Ferrell Foundation, a nonprofit corporation that maintains a searchable electronic collection of JFK assassination records, and two of its members, filed a

---

[1] 2023 Additional Documents Release, https://perma.cc/KP7D-QVFM.

[2] NARA Releases New Group of JFK Assassination Documents, https://perma.cc/4YEA-KQ4P.

Defs.' Mot. for Partial Summ. J.
Case No. 3:22-cv-06176-RS

1    complaint challenging the President's October 2022 postponement memorandum and various

2    alleged actions and inactions taken by NARA.  Compl., ECF No. 1.  In January 2023, Plaintiffs

3    amended their complaint to challenge the President's December 2022 memorandum.  First  Am.

4    Compl., ECF No. 21.  Plaintiffs amended their complaint again in April 2023, ECF No. 44, and

5    moved for a preliminary injunction in June 2023, ECF No. 59.

6         On July 14, 2023, the Court granted in part and denied in part Defendants' motion to

7    dismiss the Second Amended Complaint and denied Plaintiffs' motion for a preliminary

8    injunction.  *MFF I*, 2023 WL 4551066, at *3–10; Order, ECF No. 68.  The Court dismissed all of

9    Plaintiffs' claims against the President as well as Plaintiffs' arbitrary-and-capricious claim

10   against NARA.  *MFF I*, 2023 WL 4551066, at *4–6.  The Court also dismissed Plaintiffs' claim

11   seeking to compel NARA to take action under the APA or mandamus statute, except to the

12   extent Plaintiffs challenged NARA's alleged "failure to maintain accurate reference aids and to

13   release the legislative records."  *Id.* at *8.  The Court also dismissed Plaintiffs' FRA claim "to

14   the extent it references NARA's failure to pursue outstanding record searches," but otherwise

15   allowed it to proceed.  *Id.* at *9.

16        Plaintiffs then filed against NARA as sole Defendant a Third Amended Complaint

17   ("TAC"), ECF No. 77, and three additional motions for a preliminary injunction, ECF Nos. 79,

18   91, 92.  NARA moved to dismiss in part and opposed Plaintiffs' motions for a preliminary

19   injunction.  ECF Nos. 78, 90, 94.  The Court  granted in part and denied in part Defendants'

20   motion to dismiss and denied Plaintiffs' motions for a preliminary injunction.  *MFF II*, 2024 WL

21

22

23

24

Defs.' Mot. for Partial Summ. J.
Case No. 3:22-cv-06176-RS

202975, at *1.[3]  The Court again dismissed Plaintiffs' arbitrary-and-capricious claim, as well as their APA/mandamus claim to the extent they sought to expand it beyond the limited scope the Court previously allowed.  *Id.* at *3–4.  The Court also dismissed Plaintiffs' FRA claim except to the extent previously allowed.  *Id.* at *5.  NARA filed an answer on February 1, 2024.  Def.'s Answer to Pls.' TAC, ECF No. 108.

As a result of the Court's motion-to-dismiss rulings, there are now three remaining claims:

(i)      Plaintiffs' claim seeking to compel NARA to release the so-called "legislative . . . records" (Count Two, TAC ¶ 164(b));

(ii)     Plaintiffs' claim seeking to compel NARA to "properly maintain" the central directory of identification aids (Count Two, *id.* ¶ 164(a)).

(iii)    Plaintiffs' claim that NARA has violated the Federal Records Act, 44 U.S.C. § 2905, by not requesting that the Attorney General initiate an action to recover assassination records that have been destroyed (Count Three, *id.* ¶¶ 167–76).

Defendants now move for summary judgment on the first and third of these claims.[4]

---

[3] Plaintiffs appealed to the U.S. Court of Appeals for the Ninth Circuit the Court's order denying their second, third, and fourth motions for a preliminary injunction.  Not. of Appeal, ECF No. 109.  The Court retains jurisdiction over the merits of the case.  *G & M, Inc. v. Newbern*, 488 F.2d 742, 746 (9th Cir. 1973) ("[A]n appeal from an order granting or denying a preliminary injunction does not divest the district court of jurisdiction to proceed with the action on the merits[.]").

[4] Defendant does not seek partial summary judgment on Plaintiff's second claim at this time.  NARA is presently in the process of updating the central directory and intends to move for partial summary judgment after that process is complete.

Defs.' Mot. for Partial Summ. J.
Case No. 3:22-cv-06176-RS

1

**ARGUMENT**

2

**I.    NARA IS ENTITLED TO JUDGMENT ON PLAINTIFFS' CLAIM TO COMPEL NARA TO RELEASE THE LEGISLATIVE RECORDS**

3

4          Plaintiffs' first remaining claim seeks to compel NARA to release "the legislative branch

5    records."  TAC ¶ 164(b).  Plaintiffs contend that the President's authority to postpone the release

6    of assassination records under Section 5(g)(2)(D) extends only to records of the executive

7    branch, and so the President was powerless to postpone the 25-year deadline as to legislative

8    records.  They maintain that only the legislative branch could have sought an extension of the

9    25-year deadline, and that deadline "expired on 10/26/17."  *Id.*

10          This claim fails both as a matter of law and as a matter of fact.  First, the claim fails as a

11   matter of law because the President's postponement authority under Section 5(g)(2)(D) extends

12   to all "assassination records," regardless of whether they originated in the executive or legislative

13   branch.  Second, the claim fails as a factual matter because the only information that the

14   President has postponed is information that originated in the executive branch, and, at a

15   minimum, the President is authorized to postpone the release of such information.

16          **A.    The President's Postponement Authority Applies to All "Assassination Records"**

17

18          Section 5(g)(2)(D) provides that the President's postponement authority extends to *all*

19   assassination records, regardless of whether they originated in the executive or legislative

20   branch.  Thus, when the President postponed the 25-year deadline under Section 5(g)(2)(D), he

21   did so as to all assassination records referenced in the agencies' Transparency Plans, including

22   those that may have once been in possession of the legislative branch.

23          Plaintiffs' contrary view cannot be squared with the text of the JFK Act.  In construing

24   the Act, the Court's inquiry "begins with the statutory text, and ends there as well if the text is

6

unambiguous." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (citation omitted). Here, Section 5(g)(2)(D) provides that "[e]ach assassination record" shall be publicly disclosed within 25 years unless the President certifies that continued postponement is necessary. "Assassination record," in turn, is a defined term in the statute; it means "a record that is related to the assassination of President John F. Kennedy, that was created or made available for use by, obtained by, or otherwise came into the possession of" various specified entities. JFK Act § 3. Significantly, those specified entities include entities within both the executive and legislative branches. *Id.* (specifying records formerly in possession of "any Executive agency" as well as various Congressional commission and committees). Thus, by definition, the term "assassination record" includes records that were in possession of both the executive and legislative branches. *See Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition.").

Accordingly, the President's authority to postpone the 25-year deadline as to "[e]ach assassination record" under Section 5(g)(2)(D) extends to both executive and legislative branch records. If it were otherwise—and "assassination records" meant only "executive branch records" in Section 5(g)(2)(D)—then that Section's 25-year deadline would not even apply to legislative branch records at all, and there would be no basis for Plaintiff's claim that NARA was obligated to release the legislative branch records in 2017. *See* TAC ¶ 164(b). But Congress did require that all "assassination records"—executive or legislative—be released within 25 years, while also empowering the President to postpone the release of any such records, without regard to their character. Contrary to Plaintiffs' suggestion, Section 5(g)(2)(D) says nothing about Congressional authority to postpone the release of legislative branch records. *See id.*

(referencing a deadline "for the legislative branch to seek an extension").  The statute grants that

postponement authority exclusively to the President.

In denying NARA's motion to dismiss on this basis, the Court noted that a different

section of the JFK Act—Section 9—limits the President's authority to overrule the Review

Board's determinations to "executive branch assassination record[s]" or "information contained

in an assassination record, obtained or developed solely within the executive branch,"  *MFF I*,

2023 WL 4551066, at *7 (citation omitted).  But, as the Court recognized elsewhere in its

decision, Section 9 concerns the separate process of reviewing the Review Board's initial

disclosure determination.  *See id.* at *4 n.4 (noting that the standards of Sections 6 and 9 "apply

to postponement after an initial determination by the ARRB"); *see also MFF II*, 2024 WL

202975, at *3 ("noting that Sections 6 and 9 "apply only to postponement after an initial

determination by the ARRB").  Section 9 does not address the President's postponement power

under Section 5(g)(2)(D), which the Court correctly recognized "is a separate authority that

applies after the end of the 25-year deadline."  *MFF I*, 2023 WL 4551066, at *4 n.4; *see also*

*MFF II*, 2024 WL 202975, at *5 ("Section 5(G)(2)(D) is a *distinct* authority . . . .  The periodic

review procedure outlined in Section 9(d)(2) does not apply to the President's Section 5(g)(2)(D)

authority.").  Section 9's distinction between executive and legislative records in the context of

the President's review of the ARRB's determination thus does not suggest that his authority is

limited when it comes to a postponement decision under Section 5(g)(2)D).

To the extent Section 9 is relevant to interpreting Section 5 at all, it demonstrates that

Congress knew how to differentiate between "executive branch assassination records" and

"legislative branch records" when it wanted to do so.  *See* JFK Act § 9(c)(4)(B).  But, unlike

Section 9, Section 5(g)(2)(D) does not differentiate between records in this way and instead

8

extends the President's postponement authority to "each assassination record." *See Paul Revere Ins. Grp. v. United States*, 500 F.3d 957, 962 (9th Cir. 2007) ("It is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." (alterations and citations omitted)).  And, as noted above, the President does in any event have the authority under Section 9 to postpone particular information contained in a legislative record.  *See* JFK Act § 9(d)(1) (authorizing the President to postpone information that is "contained in an *assassination record*" if that information is "obtained or developed solely within the executive branch" (emphasis added)).

In remarking that the President's Section 5(g)(2)(D) postponement authority "seems limited to records originated by the executive branch," the Court also cited the "JFK Act's legislative history"—specifically, a Senate committee report that referenced the President's postponement power as relating to "executive branch records."  *MFF I*, 2023 WL 4551066, at *7.  But because the language of Section 5 is unambiguous, legislative history cannot change its meaning.  *United States v. Lopez*, 998 F.3d 431, 443 (9th Cir. 2021) ("[L]egislative history can never defeat unambiguous statutory text." (quoting *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1750 (2020)), *reh'g en banc denied*, 58 F.4th 1108 (9th Cir. 2023); *United States v. Thomsen*, 830 F.3d 1049, 1058 (9th Cir. 2016) (courts may turn to legislative history for guidance "only 'when a statute is susceptible to two or more meanings'" (alterations and citations omitted)).  In any event, the legislative history is inconclusive, as neither the Senate committee report nor other sources of legislative history squarely addresses the President's postponement power as it relates to legislative branch records.  While the Senate Report's reference to the President's postponement power over "executive branch records" could be read to support a negative inference that the President lacks such power as to legislative records, it is equally if not more

plausible that the drafter of the report simply was not considering or addressing the postponement of legislative records in that section of the report. *See* S. Rep. No. 102-328, at 19, (1992), *as reprinted in* 1992 U.S.C.C.A.N. 2965, 2967.

Congress's decision to vest in the President postponement authority as to all assassination records is also consistent with "separation of powers principles." *MFF I*, 2023 WL 4551066, at *7. Regardless of where they originated, all of the records are now in the possession of NARA, an executive branch entity that answers to the President. Moreover, as explained in the Declaration of Rebecca Calcagno, NARA's supervisory archivist over the JFK Collection, all of the records that NARA considers "legislative branch records" actually originated in the executive branch. Decl. of Rebecca Calcagno ("Calcagno Decl.") ¶ 9. NARA considers them "legislative branch records" because NARA received them from a legislative branch entity. *Id.* ¶ 7. And, as explained in more detail below, the only information that has been withheld from these records is information that originated in the executive branch. *Id.* ¶ 9. There is no reason why Congress— as opposed to the President—should be authorized to postpone the release of such quintessentially executive information, particularly when the Act expressly recognizes this Executive prerogative. *See* JFK Act § 9(d)(1).

Accordingly, because the President lawfully postponed the release of all assassination records—including records that NARA may have received from a legislative branch entity— Plaintiffs' claim seeking to compel NARA to release the so-called legislative branch records fails as a matter of law.

**B.      The President Only Postponed the Release of Information That Originated in the Executive Branch**

Even if the President's postponement authority in Section 5(g)(2)(D) were limited in the manner suggested by the Court in *MFF I*, the President's postponement of information contained in legislative branch records was lawful under the standard articulated by the Court.

In interpreting Section 5, the Court looked to Section 9(d)(1), which "imbues the President with the 'sole and nondelegable authority to require the disclosure or postponement'" of records that are either "(1) 'an executive branch assassination record' or (2) 'information contained in an assassination record, obtained or developed solely within the executive branch.'" *MFF I*, 2023 WL 4551066, at *7 (quoting JFK Act § 9(d)(1)).   As the Senate Report accompanying the JFK Act explains,[5] this means that, even as to records that originated in the legislative branch, the President has authority to postpone information in such records if the information originated in or was developed by an executive branch entity.  *See* S. Rep. No. 102-328, at 32 (1992), *as reprinted in* 1992 U.S.C.C.A.N. 2965, 2981.  For example, the Senate Report notes that within records of the House Select Committee on Assassinations, there are staff notes that "rely in part on information obtained or developed by the CIA."  *Id.*  Under the Act, the CIA "could choose to recommend that the Review Board postpone those portions which it identifies as originat[ed] at the CIA."  *Id.* And if the Review Board declined the CIA's recommendation, the President could "postpone those sentences or words which were originated or developed by the CIA."  *Id.*

---

[5] As noted, NARA submits that the text of Section 5(g)(2)(D) is unambiguous, and so the Court need not rely on legislative history.  NARA cites the legislative history here only to the extent the Court holds that Section 5(g)(2)(D) is ambiguous and that its interpretation should be guided by legislative history.  *MFF I*, 2023 WL 4551066, at *7.

That is exactly what the President has done here.  As the Calcagno Declaration explains, in October 2021, the President directed agencies to specify which information they continued to recommend for postponement and the reasons for doing so.  Calcagno Decl. ¶ 8.  The agencies, including the CIA, then provided this information in the form of the Transparency Plans.  *Id.* NARA has reviewed the Transparency Plans, including all instances where agencies recommended postponement of information in records that NARA received from a legislative branch entity.  *Id.* ¶ 9.  NARA found that "[i]n each instance where a legislative branch record continues to be withheld, the reason for the withholding is [an executive branch equity]."  *Id.* "The most common reason for a withholding is a Social Security number of a living person."  *Id.* "[O]ther common withholdings include information about operational details, locations, and people related to the CIA."  *Id.*

Accordingly, even if the President's postponement authority is limited in the manner suggested by the Court, the President's postponement of information in the legislative records was lawful because that information originated within the executive branch.

## II.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFFS' FEDERAL RECORDS ACT CLAIM

Plaintiffs' claim under the Federal Records Act fails for multiple reasons.  As a threshold matter, Plaintiffs lack standing to pursue this claim, as they cannot show that their alleged injuries are redressable.  At a minimum, any claim is moot now because NARA has demonstrated, through the attached declaration of Judith Barnes, that the records at issue are fatally lost.  And even if Plaintiffs could clear the threshold hurdles of standing and mootness, their claim would fail on the merits for three separate reasons:  (i) Plaintiffs lack a cause of action, (ii) the FRA does not impose a referral obligation on NARA as to destroyed records, and

Defs.' Mot. for Partial Summ. J.
Case No. 3:22-cv-06176-RS

(iii) even if the FRA imposed such an obligation in some circumstances, it should not be interpreted to do so here, where the destroyed records are unrecoverable.

### A.    Plaintiffs Lack Standing to Assert a Federal Records Act Claim

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citation omitted).  To have standing, Plaintiffs must show "(i) that [they have] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413,  423 (2021) (citation omitted).

With respect to the third prong—redressability—Plaintiffs must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  In the context of the FRA specifically, Plaintiffs must show that  "there is a 'substantial likelihood' that the Attorney General could find some [federal records]." *Cause of Action Inst. v. Pompeo*, 319 F. Supp. 3d 230, 234 (D.D.C. 2018).  And at the summary judgment stage, Plaintiffs "can no longer rest on . . . mere allegations," but must "set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (quoting *Lujan,* 504 U.S. at 561).

Plaintiffs cannot make that showing here.  Plaintiffs allege that the "Secret Service destroyed certain files after the ARRB had requested the records." TAC ¶ 61(f) n.79 (citing ARRB Final Report at 149).  But Plaintiffs do not point to any evidence suggesting that these

13

records, which were destroyed decades ago,[6] could now be recovered, as would be required to demonstrate redressability. *See, e.g.*, *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 148 (D.D.C. 2013) (lawsuit seeking recovery of "destroyed" records would become moot if records were "permanently unrecoverable"); *ACLU of Fla. v. ICE*, No. 1:22-cv-01129 (CJN), 2023 WL 6461053, at *6 (D.D.C. Aug. 31, 2023) (plaintiffs had sufficiently alleged redressability because, unlike here, they had "adequately alleged that 'deleted' videos could be recovered"). Moreover, NARA has submitted a declaration from the supervisor who oversaw disposal of records at the facility where the records were stored in 1994, explaining that the destruction of the Secret Service records was in accordance with an approved records schedule carried out by the Washington National Records Center, which is part of NARA. *See* Decl. of Judith Barnes ("Barnes Decl."). The records were irrevocably destroyed through a process known as pulping, such that they became "permanently unrecoverable," and "fatally lost" even at the time of destruction nearly thirty years ago. *CREW*, 916 F. Supp. 2d at 148; Barnes Decl. ¶¶ 7-8. Accordingly, the judicial relief that Plaintiffs seek—requiring NARA to request that the Attorney General initiate an action to try to recover the records—would not make it any more "likely" that Plaintiffs' injury would be redressed. Even if the Attorney General were to act on a request by NARA, it is simply impossible to recover records that are permanently unrecoverable. Barnes Decl. ¶¶ 7-8.

In its prior order, the Court recognized that, to establish redressability, "Plaintiffs must show that 'there is a substantial likelihood the Attorney General could find some federal

---

[6] *See* AARB Final Report at 149, Assassination Records Review Board, Final Report of the Assassination Records Review Board, https://perma.cc/F42P-DP7G (referencing destruction in January 1995 of presidential protection survey reports for some of President Kennedy's trips in the fall of 1963).

records.'"  *MFF II*, 2024 WL 202975, at *5 (alterations omitted) (quoting *Cause of Action Inst.*, 319 F. Supp. 3d at 234).  The Court, however, denied Defendants' motion to dismiss for lack of standing on the ground that "the government bears the burden of showing 'fatal loss' of the records to establish mootness," and could not satisfy that burden on a motion to dismiss.  *Id.* (citation omitted).

As an initial matter, Defendant's principal argument is that Plaintiffs lack *standing*—that is, Plaintiffs cannot show that, at the time they filed their complaint, they satisfied the elements of injury, causation, and (specifically) redressability.  While standing is related to mootness, the two doctrines are distinct.  *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000).  Whereas standing depends on the facts "as they exist when the complaint is filed," *Lujan*, 504 U.S. at 569 n.4 (citation omitted), mootness requires that a plaintiff continue to maintain a personal interest throughout the litigation, *see Friends of the Earth*, 528 U.S. at 189.

Importantly, while the defendant may bear the burden to establish mootness, *Demery v. Arpaio*, 378 F.3d 1020, 1025 (9th Cir. 2004), a plaintiff always bears the burden to establish standing, *Lujan*, 504 U.S. at 561.  Thus, it is Plaintiffs—not Defendant—who bear the burden of demonstrating that a favorable order could redress their injury—*i.e.*, that there is a substantial likelihood that such an order could lead to the recovery of federal records that had been destroyed.  Because Plaintiffs have come forward with no allegations (or evidence) suggesting that the destroyed records could be recovered—and because they could not do so given the records' permanent destruction—Defendant is entitled to judgment as a matter of law.  *See Washington Env't Council*, 732 F.3d at 1139 (at summary judgment, Plaintiff must establish standing "by affidavit or other [specific] evidence").

15

1   But even if the Court were to analyze this issue as one of mootness under which NARA

2   bears the burden, *see MFF II*, 2024 WL 202975, at *5, it has easily met that burden here.  As

3   noted, the Secret Service records at issue were destroyed in accordance with an approved records

4   schedule nearly 30 years ago.  *See* Barnes Decl. ¶¶ 5-7; AARB Final Report at 149.  As Ms.

5   Barnes explains, the records, which existed only in hard copy form, were pulped and converted

6   into new paper products, and have long been permanently unrecoverable.  Barnes Decl. ¶ 7.

7   Thus, this case is unlike cases where courts have allowed similar claims to proceed on the

8   premise that deleted electronic records might be recoverable.  *See, e.g.*, *ACLU of Fla.*, 2023 WL

9   6461053, at *6. !

10   Accordingly, because Plaintiffs lack standing to pursue their FRA claim (or, alternatively,

11   because NARA has shown that it is moot), NARA is entitled to judgment on this claim.

12   **B.    Plaintiffs' Federal Records Act Claim Fails As a Matter of Law**

13   Even if Plaintiffs had standing to pursue their FRA claim, that claim fails as a matter of

14   law.  Plaintiffs allege that NARA has violated 44 U.S.C. § 2905(a), which provides, in pertinent

15   part:

16   > The Archivist shall notify the head of a Federal agency of any
17   > actual, impending, or threatened unlawful removal, defacing,
       > alteration, or destruction of records in the custody of the agency
18   > that shall come to the Archivist's attention, and assist the head of
       > the agency in initiating action through the Attorney General for the
19   > recovery of records unlawfully removed and for other redress
       > provided by law.  In any case in which the head of the agency does
20   > not initiate an action for such recovery or other redress within a
       > reasonable period of time after being notified of any such unlawful
21   > action, the Archivist shall request the Attorney General to initiate
       > such an action, and shall notify the Congress when such a request
22   > has been made.

23

24

Plaintiffs contend that NARA "has not referred to the Attorney General for enforcement of the destruction, loss, or removal of Assassination Records by certain agencies identified by the ARRB." TAC ¶ 172.  This claim fails for at least three independent reasons.

### 1.   Plaintiffs Lack a Cause of Action

As a threshold matter, Plaintiffs lack a cause of action to sue directly under the FRA.  As the Supreme Court has recognized, "[n]o provision of [the FRA] . . . expressly confers a right of action on private parties," and no "private right of action can be implied." *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 148 (1980); *see also Armstrong v. Bush*, 924 F.2d 282, 292 (D.C. Cir. 1991) ("In *Kissinger*, the Supreme Court held that the FRA does not contain an implied cause of action . . . ."); *Citizens for Resp. & Ethics in Washington v. DHS*, 592 F. Supp. 2d 111, 121 (D.D.C. 2009) ("*CREW I*") ("There is no express or implied provision in the FRA allowing for a private party to sue an agency for an FRA violation."), *appeal dismissed*, No. 09-5014, 2009 WL 4250490 (D.C. Cir. Nov. 13, 2009).

While courts have allowed certain types of FRA-related claims to proceed under the APA, *see CREW I*, 592 F. Supp. 2d at 121, Plaintiffs do not assert such an APA claim here. Count Three asserts "violations of [the] Federal Records Act," without reference to the APA. *See* TAC at 60 & ¶¶ 167–76 (asserting "violations of [the] Federal Records Act," without reference to the APA).  And while Counts One and Two assert APA claims, those counts do not reference any alleged violation of the FRA. *See id.* ¶¶ 150–66 (asserting claims under the APA, but without referencing any violation of the FRA).

If Plaintiffs were pursuing an FRA-related claim under the APA, they would need to identify the specific provision of the APA on which they were relying and explain how they can satisfy the APA's various threshold requirements. *See, e.g.*, *Plaskett v. Wormuth*, 18 F.4th 1072,

17

1082 (9th Cir. 2021) (noting that plaintiffs can seek to compel agency action under APA § 706(1), but only if they identify a "specific, unequivocal command placed on the agency to take a discrete agency action"). Plaintiffs have not done so here. Because Plaintiffs lack a cause of action to assert a claim under the FRA and have not asserted an FRA-related claim under the APA, Count Three fails as a matter of law.

### 2. Section 2905's Referral Obligation Does Not Extend to Documents Allegedly Destroyed (as Opposed to Documents Unlawfully Removed)

Even if Plaintiffs had a cause of action under Section 2905, that provision does not unequivocally command NARA to request that the Attorney General initiate an action when records are allegedly destroyed. Rather, as Defendants argued in their motion to dismiss, a referral to the Attorney General is required only "for the recovery of records *unlawfully removed*," and when an agency head does not himself initiate a recovery action "within a reasonable period of time." 44 U.S.C. § 2905(a) (emphasis added). Accordingly, courts have dismissed FRA claims brought under an analogous provision, 44 U.S.C. § 3106(a), seeking to compel agency heads to request that the Attorney General initiate an action when records have been allegedly destroyed. *See, e.g.*, *CREW II*, 916 F. Supp. 2d at 146 ("[T]he only time an agency head has a mandatory enforcement duty is when records have been unlawfully removed—but not when they have been unlawfully destroyed" (alterations omitted)); Defs.' Mot. to Dismiss at 23–24 (collecting cases), ECF No. 23; *but see Project on Gov't Oversight, Inc. v. NARA*, No. 23-CV-2564 (DLF), 2024 WL 4286109, at *5 (D.D.C. Sept. 25, 2024) (interpreting § 3106 and opining that "the Archivist's referral duty is triggered upon any of the seven forms of record mismanagement listed in § 3106(a)"); *Am. First Legal Found. v. Becerra*, No. CV 24-1092 (RC), 2024 WL 3741402, at *8 (D.D.C. Aug. 9, 2024) (similar).

In denying NARA's motion to dismiss on this basis, the Court relied on a difference in the language of Section 2905 and Section 3106. *See MFF I*, 2023 WL 4551066, at *9. Whereas Section 3106 requires an agency head to initiate action through the Attorney General "for the recovery of records . . . unlawfully removed," Section 2905 requires the Archivist to assist an agency head in initiating an action through the Attorney General "for the recovery of records unlawfully removed *and for other redress provided by law*." *Id.* (citation omitted). The Court thus stated that Section 2905 "seems to impose a broader referral duty on the Archivist than § 3106(a) imposes on agency heads" and that the cases interpreting Section 3106 were "not persuasive." *Id.*

But nothing in the text of Section 2905 suggests that the "other redress" contemplated in that section includes an action to recover documents that have already been destroyed, and such an interpretation would "raise some peculiar practical and constitutional difficulties." *CREW v. SEC*, 916 F. Supp. 2d at 148. When records are removed from an agency, "the legal redress the Attorney General would seek would take the form of a civil replevin action against the holder of the records." *Id.*; *see also*, *e.g.*, *United States v. Red Lake Band of Chippewa Indians*, 827 F.2d 380 (8th Cir. 1987) (example of such an action). That conclusion supports the interpretation that the reference to "other" redress in Section 2905 was Congress's way of making clear that when the Attorney General brings an action alleging an unlawful removal of records, he is not limited to "recovery" as a remedy, but can instead seek "other redress" for that unlawful removal. Put differently, the term "other" requires a preceding referent, and relying on "unlawfully removed" as that referent is at odds with basic grammar and a natural reading of the statutory language. Relying on "recovery" as the referent for "other," by contrast, harmonizes the language of the provision and is grammatically correct.

Furthermore, as a practical matter, when records are unlawfully destroyed rather than removed, it is far less clear what action the Attorney General might file to recover them.  The relevant language of the statute has remained essentially unchanged since it was promulgated in 1950[7]—a time long before electronic records—and it is highly implausible that the 1950 Congress believed that records, once destroyed, could be forensically recovered.

Even if there were some conceivable action that the Attorney General might file to recover destroyed records, that would raise the highly unusual prospect of the Department of Justice suing a federal agency that it is simultaneously responsible for defending in litigation. *See CREW II*, 916 F. Supp. 2d  at 148 ("Requiring the Attorney General to bring suit against another federal agency—which is typically represented by the Department of Justice—would be highly unusual, and it is difficult for this Court to overlook the 'constitutional oddity of a case pitting two agencies in the Executive Branch against one another.'" (quoting *SEC v. Fed. Lab. Rels. Auth.*, 568 F.3d 990, 996 (D.C. Cir. 2009) (Kavanaugh, J., concurring)).   Such a reading of the FRA would risk "tension with the constitutional structure." *SEC*, 568 F.3d at 997 (Kavanaugh, J., concurring).   Because the text and structure of the statute avoids such constitutional questions, the Court need not resolve them.  But if the Court were to determine that the statute is ambiguous, the canon of constitutional avoidance would nevertheless favor NARA's "fairly possible" reading of the text "by which the question may be avoided." *Jennings v. Rodriguez*, 138 S.Ct. 830, 842 (2018) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

---

[7] *See* Federal Records Act of 1950, Pub. L. No. 81-754, § 505(b), 64 Stat. 578, 585 (1950) ("The Administrator . . . shall notify the head of any Federal agency of any actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of such agency that shall come to his attention, and assist the head of such agency in initiating action through the Attorney General for the recovery of such records as shall have been unlawfully removed and for . . . other redress as may be provided by law.")

Defs.' Mot. for Partial Summ. J.
Case No. 3:22-cv-06176-RS

Nor does the legislative history of Sections 2905 and 3106 support Plaintiffs' interpretation.  In its motion to dismiss decision, the Court noted that the House committee report accompanying the 1984 amendment to Sections 2905 and 3106 "only discusses the provision in the context of initiating action for the 'recovery of records unlawfully removed,'" whereas the final conference report "explained the provision as requiring the Archivist to make a referral to the Attorney General if they are aware of 'any such unlawful action,' where 'destruction' was listed several sentences before as one action prohibited by law."  *MFF I*, 2023 WL 4551066, at *9 (citing H.R. Rep. No. 98-707, at 21; H.R. Rep. No. 98-1124, at 27 (1984) , *as reprinted in* 1984 U.S.C.C.A.N. 3894, 3902 (Conf. Rep.)).  But the same section of the conference report confirms that Congress was concerned with records that were unlawfully *removed*.  The report notes that the conferees were mindful of "protracted private litigation over the *removal* by a former agency head of what he considered personal papers."  H.R. Rep. No. 98-1124, at 28 (emphasis added).  The conferees therefore clarified that the statute "authorize[s] the Archivist independently to seek the initiation of action by the Attorney General *for the recovery of such records*."  *Id.* (emphasis added).

### 3. In the Alternative, NARA Is Entitled to Summary Judgment Because the FRA Does Not Require a Referral to the Attorney General in these Circumstances

Even if the Court were to conclude that (i) Plaintiffs have standing, (ii) this claim is not moot, (iii) Plaintiffs have a cause of action, and (iv) that cause of action potentially extends to destroyed records, Defendants are entitled to summary judgment because the FRA should not be interpreted to require the Archivist to make a referral to the Attorney General in these circumstances.  As noted above, the records at issue were "pulped" nearly 30 years ago and are now permanently unrecoverable.  *See* Barnes Decl. ¶¶ 7-8.  Under these circumstances, the FRA

1  should not be interpreted to mandate that the Archivist request that the Attorney General initiate

2  some unspecified action "for other redress provided by law." 44 U.S.C. § 2905(a). If it were

3  otherwise, the Archivist would be required to make such a referral whenever a record is

4  unlawfully destroyed, regardless of the prospect of retrieval. Nothing in the FRA suggests that

5  Congress would have intended the Archivist, and potentially the Attorney General, to undertake

6  such a fruitless endeavor. Even if Plaintiffs could somehow establish standing and a live

7  controversy notwithstanding that the records are unrecoverable, their claim fails as a matter of

8  law on the merits.

9

10  **CONCLUSION**

        The Court should grant NARA's motion and enter summary judgment for Defendant on

11  Plaintiffs' Third Cause of Action and that part of their Second Cause of Action alleging a

12  "failure . . . to release the legislative records." *MFF I*, 2023 WL 4551066, at *8.

13

14  Dated: October 18, 2024                    Respectfully submitted,

15                                             BRIAN M. BOYNTON
16                                             Principal Deputy Assistant Attorney General

17                                             ELIZABETH J. SHAPIRO
                                               Deputy Branch Director

18                                             */s/ M. Andrew Zee*
19                                             M. ANDREW ZEE (CA Bar No. 272510)
                                               JOHN ROBINSON (DC Bar No. 1044072)
20                                             Attorneys
                                               Civil Division, Federal Programs Branch
21                                             U.S. Department of Justice
                                               450 Golden Gate Avenue, Room 7-5395
22                                             San Francisco, CA 94102
                                               Telephone: (415) 436-6646
23                                             E-mail: m.andrew.zee@usdoj.gov

24                                             *Attorneys for Defendants*